In the

# United States Court of Appeals

## For the Seventh Circuit

No. 12-1723

WARNETHER A. MUHAMMAD,

*Plaintiff-Appellant,*

*v.*

CATERPILLAR, INC.,

*Defendant-Appellee.*

Appeal from the United States District Court for the
Central District of Illinois.
No. 09-cv-2172 — **Michael P. McCuskey**, *Judge.*

ARGUED OCTOBER 4, 2013 — DECIDED SEPTEMBER 9, 2014

Before EASTERBROOK, ROVNER, and WILLIAMS, *Circuit Judges.*

ROVNER, *Circuit Judge.* Warnether Muhammad alleges that his coworkers at Caterpillar, Inc., created a hostile work environment by subjecting him to sexual and racial harassment and that his supervisor retaliated by suspending him after he complained about it. Upon receiving a right-to-sue letter from the Equal Employment Opportunity Commission, Muhammad

sued Caterpillar under Title VII. The district court granted summary judgment for Caterpillar. Because the company reasonably responded to the complaints of harassment, and no evidence suggests that Caterpillar suspended Muhammad because he complained, we affirm the judgment.

We recite the facts in the record in the light most favorable to Muhammad. *See Cannon v. Burge*, 752 F.3d 1079, 1088 (7th Cir. 2014). In 2006, after some of Muhammad's coworkers made offensive comments, both orally and in writing, about his race and his perceived sexual orientation, Muhammad complained to management, and the company responded.

The offensive oral comments occurred over the course of several months and came from three different employees. In the first incident, a coworker called Muhammad a "black nigger." Muhammad complained to human resources. After the complaint, that employee never made any further racial comments to Muhammad. A different coworker stated that he did not like Muhammad's "black faggot ass," and Muhammad reported the statement to his supervisor, Kipp Edwards, who brought the complaint to human resources. Muhammad had no subsequent problems with that employee. Finally, yet another employee told Muhammad that her grandchildren are black, that she does not like them or black people generally, and that she wished her daughter had dated a white man. Edwards brought that complaint to human resources as well. The next month, the same employee commented to Muhammad that "his black butt should have stayed fired," but Muhammad never reported this single, additional incident to Caterpillar.

The company also responded to offensive comments that were scrawled on the walls of the bathroom nearest Muhammad's workstation in August 2006. The vandal (or vandals) wrote that Muhammad "is a fag, a know it all fag," that he "sucks Kippy dick" (an apparent reference to his supervisor Kipp Edwards), that he has AIDS, and that he is a "black nigger" who "should be killed." Muhammad reported the graffiti to Edwards on August 11. Edwards contacted the shift supervisor, Brad Johnson, and the labor relations representative, Melissa Schwoerer, and he immediately contacted Nu-Air—a third-party provider of painting services—to have the graffiti painted over. Similar graffiti reappeared on August 14, and Muhammad spoke with Edwards and also discussed the matter with Johnson directly who was present at the shift meeting. That evening, Edwards discussed with Muhammad that he should follow the chain of command in submitting complaints and should inform Edwards and then Edwards would communicate the information to Johnson. Edwards had Nu-Air repaint the walls again after that complaint.

Around that time (though we cannot tell precisely when), Edwards addressed the graffiti problem further by discussing it with all of Muhammad's coworkers at a shift meeting. When more graffiti appeared on August 30, Edwards once more had the walls repainted, and each person on Muhammad's line was individually warned that anyone caught defacing the walls would be fired immediately. No more graffiti appeared.

Roughly six weeks had passed when, on October 12, an incident occurred that resulted in Muhammad's suspension. On that day, Muhammad left his work station during a non-break time to use the restroom, and checked the bid board for

postings before returning to his station. Edwards confronted Muhammad concerning his use of work time to check the bid board.

The facts are in dispute as to what happened next. Edwards contends that Muhammad responded with disrespectful comments, and walked away from Edwards when he was trying to discuss the matter. Muhammad asserts that he did not act in that manner, but also states that he did not want to engage in a discussion without a union representative present. It is undisputed that Edwards decided to indefinitely suspend Muhammad and that he walked Muhammad out of the plant at that time, allegedly for insubordination. Edwards had authority only to suspend employees pending the investigation of the alleged misconduct by the company. After that internal investigation, the suspension of Muhammad was deemed appropriate. Muhammad filed a grievance through his union representative and was allowed to return to work on November 2, 2006. He was later suspended a second time and then terminated based on his conduct with his coworkers upon his return. Following the settlement of his grievance of the termination, he returned to work at Caterpillar again in July 2008 with no back pay, and was laid off due to a reduction in force in April 2009. He was later rehired at Caterpillar where he remains employed.

Based on the incidents of August-October 2006, Muhammad filed his charges of harassment and retaliation with the EEOC, and in June 2009 he received his right-to-sue letter. Shortly thereafter he filed this suit, alleging that he was harassed with offensive comments about his perceived sexual orientation and his race and that Edwards suspended him in

retaliation for reporting the offensive graffiti to the shift supervisor.

The district court granted summary judgment for Caterpillar. In rejecting the claim of sexual harassment, the court relied on our decision in *Spearman v. Ford Motor Company*, 231 F.3d 1080, 1085 (7th Cir. 2000), which held that the Title VII prohibition on discrimination based on sex extended only to discrimination based on a person's gender, and not that aimed at a person's sexual orientation. The district court also ruled that Caterpillar was not liable for any racial harassment by coworkers because, in the court's view, the company's responses to Muhammad's complaints of harassment were reasonable. Finally, the court concluded that Muhammad lacked evidence that Edwards retaliated against him for complaining about the harassment.

On appeal, Muhammad argues that his coworkers' derogatory comments about sexual orientation were based on his sex. He asserts that his coworkers would not have directed their comments "towards a female in the workplace notwithstanding her sexual preferences" and that "[i]t is … conceivable to believe that he was harassed because he was a male who did not, in the mind [sic] of his harassers, act like a male." We are not persuaded for two reasons.

First, Muhammad's argument, made for the first time on appeal, that his coworkers would not have harassed a female for her sexual preferences is speculation. At summary judgment, Muhammad must produce evidence to support his assertions, *see Diadenko v. Folino*, 741 F.3d 751, 757–58 (7th Cir.

2013); *Singer v. Raemisch*, 593 F.3d 529, 533 (7th Cir. 2010), yet he points us to none.

Second, even if we set that problem aside, another more fundamental obstacle blocks Muhammad's claim that Caterpillar is liable for sexual and racial harassment: Caterpillar reasonably responded to Muhammad's complaints. *See Berry v. Chicago Transit Auth.*, 618 F.3d 688, 692 (7th Cir. 2010) (explaining that employer cannot be liable if it "took prompt action that was reasonably likely to prevent a reoccurrence.") After Muhammad reported to Caterpillar his coworkers' offensive comments and the company responded, only one of the coworkers made another similar remark. But Muhammad never reported that isolated statement. "An employer is not liable for co-employee sexual harassment when a mechanism to report the harassment exists, but the victim fails to utilize it." *Durkin v. City of Chicago*, 341 F.3d 606, 612–13 (7th Cir. 2003); *see also Montgomery v. American Airlines, Inc.*, 626 F.3d 382, 392 (7th Cir. 2010) ("An aggrieved employee must at least report—clearly and directly—nonobvious policy violations troubling him so that supervisors may intervene.").

As for the graffiti, Caterpillar responded quickly each time Muhammad reported it, and it soon stopped the problem permanently. The company engaged Nu-Air three times in August to paint over the offending comments; two of those times were within three days of each other. Muhammad's supervisor, Edwards, also addressed the graffiti problem at a shift meeting, and after the third repainting, each coworker on Muhammad's line was warned that Caterpillar would immediately fire any employee caught defacing the walls. Muhammad concedes that the graffiti never reappeared after that warning.

Even though the graffiti never resurfaced after the threat to terminate offenders, Muhammad insists that Caterpillar should have done more to identify who was responsible for the graffiti and to punish all coworkers who harassed him. But Title VII requires only that employers take action reasonably calculated to stop unlawful harassment; that requirement does not necessarily include disciplining the employees responsible for past conduct. *See Porter v. Erie Foods Int'l*, 576 F.3d 629, 637 (7th Cir. 2009)("In assessing the corrective action, our focus is not whether the perpetrators were punished by the employer, but whether the employer took reasonable steps to prevent future harm."); *Lapka v. Chertoff*, 517 F.3d 974, 984–85 (7th Cir. 2008). Given that Caterpillar's prompt response halted the harassment that Muhammad brought to its attention, the company is not liable under Title VII for not doing more to hunt down the guilty coworkers for punishment.

That leaves only Muhammad's retaliation claim. Title VII prohibits employers from retaliating against employees for their opposition to unlawful employment practices. *See* 42 U.S.C. § 2000e-3(a). Muhammad alleges that the initial suspension constituted retaliation against him for his complaint of harassment. This retaliation claim concerns only the actions of Edwards, and therefore is limited to the initial indefinite suspension because Edwards was not a decision-maker in the subsequent suspension and termination decisions, and Muhammad does not raise arguments related to those actions. As to the initial suspension, Edwards maintains that Muhammad was suspended because he left his work station during a non-break time to check the bid board and when Edwards attempted to discuss the impropriety of that action

and other concerns with Muhammad, Muhammad responded disrespectfully, refused to talk with him, and walked away from him as he was speaking. Muhammad asserts in his statement of undisputed facts that he "believes Edwards suspended him in October 2006 because he went over his head and complained to Boyd Johnson about sexual harassment." The complaint to Johnson involved the graffiti in the restroom.

The first problem is that the only complaint of "sexual harassment" made by Muhammad is of statements regarding his sexual orientation, which is not prohibited conduct under Title VII. Accordingly, Muhammad cannot maintain a retaliation claim based on a complaint of conduct that is not covered under Title VII, and summary judgment was proper on that basis alone. *See Hamner v. St. Vincent Hosp. and Health Care Center, Inc.*, 224 F.3d 701, 707–08 (7th Cir. 2000)(retaliation claim failed because the conduct the plaintiff opposed (harassment based on his sexual orientation) was not proscribed by Title VII); *Magyar v. Saint Joseph Regional Medical Center*, 544 F.3d 766, 771 (7th Cir. 2008).

Because the graffiti included racial epithets as well, however, the district court considered whether the claim could nonetheless survive on that basis. Even that broad construction, however, does not salvage the claim. Muhammad has not identified any similarly-situated persons who were treated differently, and in fact eschews any reliance on the "indirect method" of establishing retaliation. *See generally Andrews v. CBOCS West, Inc.*, 743 F.3d 230, 234 (7th Cir. 2014) (noting that retailiation can be proven using either the direct or indirect method and setting forth the factors relevant to each method). He instead argues that he should survive summary judgment

under the direct method of proof, under which a plaintiff may demonstrate through direct or circumstantial evidence that the adverse action by the employer was motivated by an impermissible purpose. *Cerutti v. BASF Corp.*, 349 F.3d 1055, 1061 (7th Cir. 2003). This may include, for example, such direct evidence as an admission by the employer of an impermissible animus. In addition, it includes circumstantial evidence that is strong enough, taken as a whole, to allow the trier of fact to draw the inference of such animus. *Morgan v. SVT, LLC*, 724 F.3d 990, 995 (7th Cir. 2013). We have used the metaphor of a "convincing mosaic of circumstantial evidence," evincing the image of a mosaic whose individual tiles add up to a complete picture, but that is just one means of conceptualizing the requirement that the circumstantial evidence must be sufficient to support the necessary inference. *Id.*; *Sylvester v. SOS Children's Villages Illinois, Inc.*, 453 F.3d 900, 903–04 (7th Cir. 2006)(noting that a case of discrimination may be made by assembling pieces of evidence, none meaningful in itself, but which taken as a whole provide strong support of discrimination, even if that evidence does not present the picture characterized by the language discussing the "mosaic" of circumstantial evidence). "If the plaintiff can assemble from various scraps of circumstantial evidence enough to allow the trier of fact to conclude that it is more likely than not that discrimination lay behind the adverse action, then summary judgment for the defendant is not appropriate, and the plaintiff may prevail at trial even without producing any 'direct' proof." *Morgan,* 724 F.3d at 996. Regardless of the type of evidence presented—whether direct or circumstantial or both—the ultimate inquiry is whether the evidence is sufficient to allow

the trier of fact to conclude that the employer took an adverse action against Muhammad because of his complaint of harassment. Here, Muhammad makes no effort to establish an admission of such animus or to otherwise present direct evidence of it, and he has failed to present evidence that rises above the type of speculation that is insufficient to survive summary judgment. *Perez v. Thorntons, Inc.*, 731 F.3d 699, 716 (7th Cir. 2013)("It is not sufficient that a jury might guess or speculate that gender or 'race might have made a difference in the decision,' because 'guesswork and speculation are not enough to avoid summary judgment.'"), quoting *Good v. University of Chicago Medical Center*, 673 F.3d 670, 675 (7th Cir. 2012).

Muhammad acknowledged that he left his workstation during a non-break time to use the restroom, and that he checked the bid board to see what jobs were posted in the plant before returning to the station. He concedes that Edwards confronted him concerning his use of non-break time to check the bid board. Although he states that he did not walk away while Edwards was speaking to him, his testimony is vague as to what happened. He acknowledged in his testimony that he did not want to discuss the situation with Edwards without union representation, and in his response to the motion for summary judgment below he appears to employ that as a justification for his refusal to continue the conversation: "Edwards stated that [the suspension] was because [Muhammad] walked away from him when he was discussing his absence from his work station. But Muhammad wanted a Union Steward to be present because he feared disciplinary action would be discussed." Whether or not Muhammad

walked away, it is undisputed that Edwards approached Muhammad with a concern about his work performance, and that some conflict arose in the course of discussing the matter. After that engagement, Edwards decided to suspend Muhammad and walked him out of the plant. Such evidence is consistent with the defendant's characterization of the suspension as having been based on Muhammad's conduct in the course of that discussion.

The evidence submitted by Muhammad indicating that the suspension was retaliatory in violation of Title VII is minimal. Muhammad presents only testimony that at the shift meeting in August after he complained of the graffiti to Johnson, Edwards "mentioned" to him that he should follow the proper chain of command in submitting complaints and told him that he should present them first to Edwards and then Edwards would report to Johnson. Pltfs. Dep. at 71. Muhammad does not state that Edwards was angry in that exchange, and does not even remember precisely when the conversation occurred. There is virtually no evidence, other than the possible temporal proximity, that the conversation played a role in the suspension, and we have repeatedly held that mere temporal proximity is rarely sufficient. *See Cung Hnin v. TOA (USA), LLC*, 751 F.3d 499, 508 (7th Cir. 2014); *Tomanovich v. City of Indianapolis*, 457 F.3d 656, 665 (7th Cir. 2006). There is no indication here that the chain-of-command conversation was anything more than a reminder as to the proper procedures of the workforce. Muhammad's complaint to Johnson had occurred over a month before his suspension, when the graffiti appeared in the restroom. Edwards had already communicated the same information to Johnson, and had continued to consult Johnson

as to the proper response to take in the ensuing graffiti incidents. Edwards did not admonish Muhammad at the time of the complaint or take any action to impede him from contacting Johnson. There is in short no reason to believe that Muhammad's communication with Johnson led to the decision to suspend him. In fact, when asked in his deposition why he was suspended, Muhammad repeatedly stated either that he did not know or that he was told it was because of poor performance, not that it was because of his complaint to Johnson. He later stated that he believes it may be related to his decision to complain to Johnson directly about the harassment, but that is nothing more than speculation on his part. More is needed to establish evidence sufficient to survive summary judgment.

Muhammad also asserts that his actions in checking the bid board could not have been the actual reason for his suspension because he personally knows of others who engaged in similar conduct and were not disciplined. But Muhammad provides no names, affidavits, or other evidence as to such persons. Moreover, the argument ignores that Edwards premised the suspension on his handling of the conversation about the bid board, not his conduct in checking the bid board. Muhammad has provided only conjecture as to the reason for his suspension and that is insufficient to survive summary judgment. Accordingly, the district court did not err in granting summary judgment on the retaliation claim as well.

The decision of the district court is AFFIRMED.