[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 18-12365
Non-Argument Calendar

_____

D.C. Docket No. 1:17-cv-00100-MW-GRJ

JACK ANTERIO,

Plaintiff-Appellant,

versus

CITY OF HIGH SPRINGS FLORIDA,

Defendant-Appellee.

_____

Appeal from the United States District Court
for the Northern District of Florida

_____

(March 8, 2019)

Before MARTIN, ROSENBAUM, and NEWSOM, Circuit Judges.

PER CURIAM:

Jack Anterio, a white male, is a former police chief of the City of High Springs, Florida (the "City"). After he was discharged from that position, he filed a lawsuit against the City alleging whistleblower retaliation in violation of Fla. Stat. § 112.3187, and race discrimination in violation of the Florida Civil Rights Act, Fla. Stat. § 760.10, and Title VII, 42 U.S.C. § 2000e-2(a)(1). The district court granted summary judgment to the City. Anterio appeals, arguing that summary judgment wasn't appropriate because he made disclosures of information protected by the whistleblower retaliation statute, and because he presented a "convincing mosaic" of circumstantial evidence that he was fired because of his race. After careful review, we affirm the grant of summary judgment.

**I.**

The relevant facts, viewed in the light most favorable to Anterio, are as follows. In February 2015, the City, a small town outside of Gainesville, hired Anterio as its police chief. Previously, Anterio had been a police lieutenant in Hollywood, Florida. He applied for the chief position with the City because he wanted an opportunity to command an agency, which wasn't possible in Hollywood's 400-person police department. The employment agreement Anterio signed with City Manager Edwin Booth stated that he could be terminated with or without cause, and that the city manager was the "sole judge" of his performance.

2

Before Anterio was hired, the City's police department had been run for approximately one year by an acting police chief, Lieutenant Antoine Sheppard, the highest-ranking officer in the department, after a previous chief, Steve Holley, a white male, was fired by Booth. Anterio knew going in to the job that the department was troubled. He had researched the department and spoken with a prior police chief (not Holley), who had performed an audit of the department. The prior chief told Anterio that the department lacked leadership, its policies and procedures were a mess, and it was unorganized and understaffed. Booth likewise was aware of these issues, and he asked Anterio to bring leadership, accountability, direction, and discipline to the police department.

When Anterio took over as chief, he immediately took steps to professionalize and re-orient the police department. Anterio had high standards and demanded the same of his subordinates, who included Lieutenant Sheppard, a black male; Sergeant Dustyn Shenk, a white male; Acting Sergeant Kendrick Hampton, a black male; and eight or nine police officers. Additionally, Anterio initiated several community-policing initiatives, including "coffee with the chief" and a cookie-citation program. The latter program was intended to promote positive interactions between children and law enforcement. To that end, officers were directed to issue "citations" for a free cookie to children they saw behaving well or doing good deeds.

3

Many in the community appreciated Anterio's community-policing initiatives. But they were "[n]ot popular with the officers," according to Anterio. Some officers believed that the cookie citation program was a "waste of time" and interfered with their other responsibilities. A couple officers did not issue the required number of citations (five per month) and were disciplined by Anterio for insubordination, which also wasn't popular with the officers. For example, Shenk testified that he was generally in favor of the cookie-citation program but had a problem with officers being disciplined for insubordination if they didn't meet a quota.

Similarly, Anterio's efforts to professionalize the police department were, at times, met with resistance and resentment. Several officers offered testimony to the effect that Anterio was too demanding, not "part of the team," and quick to threaten discipline for perceived insubordination. Shenk described him as a "tyrant." Other officers, however, expressed no problems with Anterio and believed he was bringing needed change to the department.

Anterio's chief antagonist was Lieutenant Sheppard. Their relationship was rocky from the outset. Anterio had difficulty getting Sheppard to follow orders or instructions, and he believed that Sheppard lacked the leadership, multitasking abilities, and other skills necessary to serve as second in command. Sheppard, for his part, thought Anterio was too demanding and had unrealistic expectations.

4

Both Anterio and Sheppard raised their respective concerns to Booth. Anterio and Booth met regularly to discuss "goings-on," including Anterio's issues with Sheppard. In June 2015, Anterio recommended to Booth that Sheppard be demoted back to sergeant. Booth declined to adopt the recommendation, noting that Sheppard was related to a city commissioner. A few months later, in September, Anterio again raised concerns to Booth about Sheppard's ability to be second in command. Anterio suggested putting Sheppard in control of the patrol division, where he seemed to be more comfortable, and promoting to lieutenant— skipping the rank of sergeant—a newly hired officer named Christopher Stroup. Stroup was a veteran officer who had worked with Anterio's son at the Palm Bay Police Department. Booth again declined, stating that the "union would eat him alive" if he did as Anterio suggested. Anterio testified that his relationship with Booth was "very good" until he began raising concerns about Sheppard.

Meanwhile, at a meeting on August 31, 2015, Sheppard told Booth that morale within the department was down and that Anterio was setting him up for failure and creating a "hostile work environment." Sheppard also relayed information from another officer that Anterio had made racial jokes using the n-word. Booth spoke with Anterio about these complaints and assured him that Sheppard was "just crying." A little over a month later, on October 12, Sheppard prepared an eight-page memorandum detailing his complaints about Anterio to

5

Booth and Jenny Parham, the City Clerk and part-time assistant to Booth. The memorandum included one small paragraph on the racial-joke allegations. Meanwhile, two officers in October 2015 made comments to the effect that they did not expect Anterio to remain as chief for much longer.

When Booth appeared to take no action in response to Sheppard's memorandum, Sheppard took his complaints about Anterio to Evelyn Foxx, the President of the local chapter of the NAACP, on November 4, 2015. This was two days after Anterio had told Sheppard that he planned to demote him to sergeant. Sheppard told Foxx that the workload was excessive, that morale was low, and that Anterio had made racial jokes on two occasions. Foxx, in turn, called Booth and requested a meeting. She then met with Booth and Mayor Sue Weller. According to Booth, Foxx stated that the black community was upset and was "going to march on City Hall." Booth promised to investigate the complaints and interview officers within the police department. In the interest of "total transparency," Booth agreed to allow Foxx to attend these interviews but not to ask questions. At some point, members of the press were contacted regarding the allegations against Anterio.

Anterio found out about Sheppard's NAACP complaint the following morning. He then spoke with Booth, who gave him a copy of Sheppard's memorandum. Anterio requested an opportunity to respond to the allegations.

6

Soon after this meeting, Booth sent an email via Parham to the mayor and the city commissioners stating, "In discussion with Chief Anterio, it was determined that High Springs was not a good match for him given the extreme policing done in Hollywood versus the low key policing in High Springs," and that "it would be in the best interest of all involved if Chief Anterio resigns." About ten minutes later, this email was forwarded to Anterio, and then, a few minutes after that, a follow-up email from Parham to the mayor and the commissioners stated that there had been a "misunderstanding" and that Anterio had "decided to answer the accusations" and would remain on the job.

On November 9, 2015, Booth told Anterio that he would be placed on administrative leave with pay while Booth investigated the allegations against him. Booth stated that he intended to speak with all police officers in the department.

Booth interviewed all, or nearly all, of the officers in the police department on November 9, with Foxx and an administrative assistant present. It appears that only one officer reported hearing any racial remarks or slurs from Anterio. None of the other officers said anything else to suggest that Anterio had acted in a racially discriminatory way. Yet nearly all officers interviewed reported that morale within the department was low, and many officers indicated that they were stressed out and unhappy. Booth never interviewed Anterio regarding these matters.

7

While Anterio was on administrative leave, Sheppard assumed control of the police department. He suspended the cookie-citation program and stated that he would be supervising all projects. After Anterio received Sheppard's email about project supervision, he called Booth on November 12 to express his belief that the email was inappropriate. During this phone call, he also advised Booth that he intended to contact the Florida Department of Law Enforcement ("FDLE") regarding various allegations of improper and unlawful conduct by officers within the police department. Anterio said that he had received complaints that several officers, including Sheppard, were providing protection for drug dealers and other individuals committing crimes. Anterio also mentioned an officer's use of inflated numbers in a grant application, which Anterio had to correct and resubmit. Booth advised him to wait for the resolution of the investigation before contacting FDLE. Anterio said he would, though he did not intend to wait. Anterio ultimately emailed the allegations to the FDLE on November 17.

Around the same time, Anterio received a call from Parham stating that Booth intended to terminate his employment at the next city commission meeting. Parham stated that, while the racial allegations against him were unfounded, Booth had determined that he was not the right fit for the agency. On November 19, Booth handed Anterio a letter stating that they had made the "mutual decision" that Anterio would be terminating his employment agreement. Anterio didn't sign the

letter, and all that Booth said at the time was that Anterio wasn't the "right fit." Anterio received a formal termination letter on November 30.

Booth testified that Anterio didn't meet his expectations for a small-town police chief. According to Booth, Anterio was a "good person" who had some good ideas, like the cookie-citation program, but he "just wasn't a small-town police chief." Booth expected things "to be quiet," for "morale to be high," and for the chief to take care of any problems that arose. But, according to Booth, "morale was low," and Anterio would come to Booth with issues in the police department, like his problems with Sheppard, instead of handling them on his own. Booth stated that he did not believe that Anterio was racially motivated in any of his actions, and he denied feeling pressure to fire Anterio due to the NAACP's involvement.

After Anterio's termination, Sheppard took over as acting police chief until a new police chief, Joel DeCoursey, was hired in early December 2015. DeCoursey, a black male, had recently retired as the police chief of the nearby city of Alachua.

## II.

Anterio's original complaint, filed in state court, alleged one count of whistleblower retaliation under Florida state law. After Anterio amended his complaint to add claims of race discrimination under Title VII and the Florida Civil Rights Act, the City removed the action to federal district court. Then,

9

following discovery, the City moved for summary judgment.  The district court granted that motion, concluding that Anterio didn't engage in protected activity under the whistleblower-retaliation statute and that the evidence failed to support his claims of race discrimination.  Anterio now appeals.

## III.

We review *de novo* a district court's order granting summary judgment, viewing all the evidence and drawing all reasonable inferences in favor of the non-moving party.  *Vessels v. Atlanta Indep. Sch. Sys.*, 408 F.3d 763, 767 (11th Cir. 2005).  Summary judgment is appropriate when the record demonstrates that there is no genuine dispute as to any material fact, and the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).

## IV.

We first address Anterio's Florida whistleblower-retaliation claim.  In analyzing this state-law claim, we are bound by decisions of Florida appellate courts on issues of state law unless there is persuasive evidence that the Florida Supreme Court would rule otherwise.  *Pendergast v. Sprint Nextel Corp.*, 592 F.3d 1119, 1133 (11th Cir. 2010).

Florida's whistleblower-retaliation statute protects employees from retaliation for making certain disclosures of information about legal violations, fraud, malfeasance, gross mismanagement, and the like.  *See* Fla. Stat. § 112.3187.

The statute sets out requirements for the nature of information disclosed, to whom the information must be disclosed, and how the disclosure must be made. *See id.* § 112.3187(5)–(7). Only the latter two requirements are at issue.

In general, the information must be disclosed "to any agency or federal government entity having the authority to investigate, police, manage, or otherwise remedy the violation or act." Fla. Stat. § 112.3187(6). When, as here, the disclosure concerns a "local government entity, . . . the information must be disclosed to a chief executive officer . . . or other appropriate local official." *Id.* An "appropriate local official" is "an official or official entity who is *affiliated with the violating governmental entity* and has the authority to investigate, police, manage, or otherwise remedy the violation or act by the violating governmental entity." *Rustowicz v. North Broward Hosp. Dist.*, 174 So. 3d 414, 424 (Fla. Dist. Ct. App. 2015) (emphasis added). The FDLE, a state agency, is not affiliated with the violating local governmental entity and therefore is not an "appropriate local official." *Quintini v. Panama City Hous. Auth.*, 102 So. 3d 688, 690 (Fla. Dist. Ct. App. 2012) ("FDLE is a state agency, not a local official.").

The form of disclosure matters as well. To be protected, an employee must make a disclosure in the ways specified in the statute, including "any written complaint to [the employee's] supervisory officials." Fla. Stat. § 112.3187(7). Under the plain language of this clause, an employee is protected only if a

11

complaint to a supervisory official is made in writing. *Crouch v. Public Service Comm'n*, 913 So. 2d 111, 111 (Fla. Dist. Ct. App. 2005).

Here, the district court properly granted summary judgment against Anterio on his Florida whistleblower-retaliation claim. Anterio argues that his written report to the FDLE is protected because the FDLE had the authority to investigate and remedy the information he disclosed. But because this case concerns information about a "local government entity," the statute required Anterio to make his disclosures to an "appropriate local official" affiliated with the violating governmental entity, which the FDLE is not. *See* Fla. Stat. § 112.3187(6); *Rustowicz*, 174 So. 3d at 424; *Quintini*, 102 So. 3d at 690.

Nor did Anterio make a "written complaint" to City Manager Booth, his supervisory official. *See* Fla. Stat. § 112.3187(7); *Crouch*, 913 So. 2d at 111. Anterio responds that the statute also protects oral disclosures made by an employee "requested to participate in an investigation, hearing, or other inquiry conducted by any agency or federal government entity." Fla. Stat. § 112.3187(7). He says that his oral disclosures to Booth count under this clause. But Anterio was not "requested to participate" in any type of inquiry during which he disclosed the information about potential unlawful conduct by his officers. While we do not attempt in this case to define the scope of this clause, we are confident that it requires something more than the informal discussions that occurred here between

12

Anterio and Booth. *See id.* So Anterio's proposed alternative for protection is unpersuasive.

For these reasons, the district court was correct to grant summary judgment on this claim.

## V.

We next consider Anterio's claims of discrimination under Title VII and the FCRA, which we analyze jointly. *See Holland v. Gee*, 677 F.3d 1047, 1054 n.1 (11th Cir. 2012) (analysis of a claim under the FCRA mirrors the analysis of a Title VII claim). Ordinarily, we evaluate claims of employment discrimination based on circumstantial evidence, which is all we have here, using the burden-shifting framework derived from *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).

But this framework is not the sole means to establish a triable issue of discrimination. A Title VII plaintiff can always survive summary judgment by presenting circumstantial evidence that creates a triable issue concerning the employer's discriminatory intent. *Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321, 1328 (11th Cir. 2011). Such "[a] triable issue exists if the record, viewed in a light most favorable to the plaintiff, presents a convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination by the decision-maker." *Id.* (quotation marks omitted). The phrase "convincing mosaic"

13

is not a legal test but rather a metaphor to illustrate that the evidence should be viewed as a whole, not "sorted into boxes," to determine whether it creates an inference of unlawful discrimination.  *See Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 764–65 (7th Cir. 2016).

A plaintiff may raise a reasonable inference of discriminatory intent "by offering evidence that [the employer] more likely than not acted with a discriminatory motive, or by showing that its proffered reasons are not credible, unless the record conclusively shows that the real motive was a non-proffered reason that is non-discriminatory." *Alvarez v. Royal Atlantic Developers, Inc.*, 610 F.3d 1253, 1265 (11th Cir. 2010).  To show that an employer's reason is not credible, the employee must meet that reason head on and rebut it; he may not merely quarrel with the wisdom of that reason.  *Chapman v. AI Transp.*, 229 F.3d 1012, 1030 (11th Cir. 2000) (*en banc*).  A plaintiff may do so by showing "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's rationale."  *Holland*, 677 F.3d at 1055–56 (quotation marks omitted).  When analyzing the employer's reasons, however, "it is not our role to second-guess the wisdom of an employer's business decisions—indeed the wisdom of them is irrelevant—as long as those decisions were not made with a discriminatory motive." *Alvarez*, 610 F.3d at 1266.

14

Anterio argues that he presented a "convincing mosaic" of circumstantial evidence showing that he was terminated based on his race. Citing an officer's testimony that Sheppard had said he would "play the race card" when "backed into a corner," Anterio contends that Sheppard and other officers in his "close circle" conspired to oust him as chief by bringing to the NAACP false accusations that he used a racial slur. Viewing this evidence against the "decade-long history of racial tensions and discriminatory conduct" against white employees within the police department, Anterio contends, amply establishes that Booth was motivated by Anterio's race and by pressure from the NAACP when he fired Anterio as police chief. We are not persuaded by Anterio's theory.

The district court properly granted summary judgment to the City on Anterio's race-discrimination claims. At best, Anterio's evidence establishes that Sheppard and other officers, as of sometime in October 2015, were planning to push Anterio out as police chief because they were unhappy with his community-policing initiatives and management style. In furtherance of that plan, Sheppard contacted the NAACP to ensure that their complaints received publicity and to force a decision by Booth. And his complaints to the NAACP included an inflammatory accusation of racial jokes and use of the n-word—an accusation we assume for present purposes was fabricated by one of the officers.

15

Even crediting this version of events, however, no reasonable jury could conclude that Booth was motivated by Anterio's race when he made the decision to terminate Anterio's employment. Nothing in the record suggests that Booth's stated reason for terminating Anterio—that he wasn't the right fit for the position—was untruthful or a pretext for discrimination. After Sheppard complained to the NAACP, Booth, who possessed the sole authority to hire and fire Anterio and to judge his performance, independently investigated the allegations by interviewing officers in the department. And it is undisputed that, during these interviews, Booth heard from numerous officers—including those without any clear connection to Sheppard's "close circle"—that morale within the department was low because of Anterio. This evidence, along with testimony from numerous officers along similar lines, is fully consistent with Booth's explanation of his reasons for concluding that, while the racial accusations against Anterio were unfounded, Anterio didn't meet his expectations for being a "small-town police chief." In short, Anterio has offered no evidence to rebut Booth's stated reasons for dismissing him as police chief. *See Chapman*, 229 F.3d at 1030; *Holland*, 677 F.3d at 1055–56.

Anterio's attempt to hold Booth responsible for Sheppard's alleged animus fails for at least two reasons. To begin with, there is little to suggest that Sheppard targeted Anterio because of his race. The bulk of Sheppard's complaints to Booth

16

and the NAACP concerned low morale in the department and Anterio's management style. As noted above, undisputed evidence in the record reflects that these were real and legitimate concerns for a number of officers.

And even assuming a discriminatory animus could be imputed to Sheppard, there is no basis in the record to transfer that animus to the termination decision. In certain circumstances, causation may be established, under the "cat's paw" doctrine, when a decisionmaker followed a biased recommendation from a non-decisionmaker without independently investigating the complaint. *Stimpson v. City of Tuscaloosa*, 186 F.3d 1328, 1332 (11th Cir. 1999). In such a case, the recommender uses the decisionmaker as a mere conduit, or cat's paw, to give effect to his discriminatory animus. *Id.* If, however, a decisionmaker conducts its own evaluation and makes an independent decision, the decision is free of the taint of a biased subordinate employee. *Pennington v. City of Huntsville*, 261 F.3d 1262, 1270–71 (11th Cir. 2001). Here, the cat's paw theory does not apply under our precedent because Booth conducted an independent investigation into Sheppard's allegations and made an independent decision to terminate Anterio based on non-discriminatory reasons.

The Supreme Court's decision in *Staub v. Proctor Hospital* does not require a different result. 562 U.S. 411 (2011). In *Staub*, the Supreme Court, in addressing a discrimination claim under the Uniformed Services Employment and

17

Reemployment Rights Act, concluded that an independent investigation did not relieve an employer of fault where the supervisor's biased act was intended to cause and proximately caused an adverse employment action. *Id.* at 422. Nonetheless, the Supreme Court stated there can be no proximate cause, and therefore no liability, if the adverse action is entirely justified apart from the biased supervisor's recommendation. *Id.* at 421–22.

Assuming *Staub* applies here, the undisputed evidence in the record indicates that any alleged bias from Sheppard was not the proximate cause of Anterio's termination.[1]   As explained above, undisputed evidence reflects that Anterio's management style was not popular and that morale within the department was low.  These facts formed the basis, in large part, for Booth's conclusion that Anterio was not the right fit for the department.  Further, Anterio offers no evidence to rebut Booth's testimony that he did not give credence to the racial accusations and that they played no role in his decision.  Accordingly, Booth's ultimate decision to terminate Anterio was "entirely justified" by the undisputed evidence in the record, apart from any bias tainting Sheppard's initial complaints. *See Staub*, 562 U.S. at 421–22.

---

[1] We have not addressed the viability of the independent-investigation defense in a race-discrimination case since the Supreme Court's decision in *Staub*.  Nor have we considered whether the discriminatory act of a non-supervisory employee, like Sheppard, could make an employer liable under a cat's paw theory.  We find it unnecessary to resolve these issues here.

18

Anterio's other evidence is insufficient to create a triable issue of discrimination. Anterio asserts that discriminatory intent may be inferred from the fact that Anterio was replaced first by Sheppard, a black male who did not meet the education requirements for the chief position, and then by DeCoursey, a black male who was paid a higher salary than Anterio. Neither fact is probative of discrimination on this record, however. Sheppard had served as acting chief for nearly a year before Anterio was hired, so his brief resumption of that role after Anterio was fired does not indicate discrimination or pretext. As for DeCoursey, he was well-qualified for the position, having served as police chief of a nearby city for several years—a qualification Anterio did not bring to the position, so the slight disparity in salaries cannot reasonably be attributed to race discrimination.

With regard to Anterio's reliance on the City's supposed history of treating white employees worse than black employees, he did not preserve this argument by raising it in his briefing at summary judgment. *See Resolution Trust Corp. v. Dunmar Corp.*, 43 F.3d 587, 598 (11th Cir. 1995) (*en banc*) ("Well-settled precedent provides that arguments not raised at the district court level will generally not be considered on appeal."). We therefore decline to review it. Nor, in any case, do we find that Anterio's historical evidence is enough to create a genuine issue of material fact. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242,

19

249–50 (1986) ("If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." (citations omitted)).

Finally, we agree with the district court that "although Anterio perceives that he was treated unfairly—particularly given his impression that he was hired to correct problems that existed in the High Springs Police Department and was seemingly fired for attempting to do just that—such perceived unfairness is not the same as unlawful discrimination. *See Alvarez*, 610 F.3d at 1266. Having concluded that undisputed evidence demonstrates that Anterio was terminated for non-discriminatory reasons, we affirm the grant of summary judgment in favor of the City.

**AFFIRMED.**