# Illinois Official Reports

## Appellate Court

---

**Lau v. Abbott Laboratories, 2019 IL App (2d) 180456**

---

| | |
|---|---|
| Appellate Court Caption | ANNA J. LAU, Plaintiff-Appellant, v. ABBOTT LABORATORIES, Defendant-Appellee. |
| District & No. | Second District<br>Docket No. 2-18-0456 |
| Rule 23 order filed<br>Motion to<br>publish allowed<br>Opinion filed | March 15, 2019<br><br>April 2, 2019<br>April 2, 2019 |
| Decision Under Review | Appeal from the Circuit Court of Lake County, No. 17-L-80; the Hon. Mitchell L. Hoffman, Judge, presiding. |
| Judgment | Affirmed in part and reversed in part.<br>Cause remanded. |
| Counsel on Appeal | William M. Walsh, of Law Office of William M. Walsh, LLC, of Chicago, for appellant.<br><br>Jon E. Klinghoffer, Meredith S. Kirshenbaum, and Michael K. Chropowicz, of Goldberg Kohn Ltd., of Chicago, for appellee. |

JUSTICE SCHOSTOK delivered the judgment of the court, with opinion.
Justices Hutchinson and Jorgensen concurred in the judgment and opinion.


**OPINION**

¶ 1    The plaintiff, Anna J. Lau, sued her former employer, the defendant, Abbott Laboratories, alleging that it discriminated against her on the basis of her sex, race, national origin, or age and that it also retaliated against her for complaining about that discrimination. The trial court granted summary judgment in Abbott's favor, and she appealed. We affirm in part, reverse in part, and remand.

¶ 2                                   I. BACKGROUND

¶ 3    The following facts are drawn from the depositions and statements of fact submitted by the parties in connection with the motion for summary judgment. Except where noted, they are undisputed, at least for our present purpose—considering whether summary judgment is warranted.

¶ 4    Lau was hired by Abbott in 1999 as a senior financial analyst, a Grade 16 position. That same year, she completed an MBA. Over the years, she worked in several different areas of Abbott, including the hospital pharmacy, point of sales, and acute care sales and forecasting divisions. At some point before 2011, Lau became a supervisor for financial analysis, a Grade 17 position. After that, she held the position of associate manager, quotas and incentives, another Grade 17 position. When that job was outsourced, she was given a separation package, but Abbott rehired her a few weeks later. Although she was rehired as a senior financial analyst, she kept her Grade 17 level, the level she retained for the remainder of her time at Abbott. Lau was not a certified public accountant (CPA).

¶ 5    In 2011, Lau was again given the title of supervisor for financial analysis, reporting to William Covington in the Global Engineering Services (GES) operations group. At the time, GES supported seven business units: Buildings and Grounds (B&G), Utilities, Housekeeping, Maintenance, Maximo/Metrology (M/M), Quality Assurance (QA), and Engineering Operations Administration (EO).

¶ 6    In her position as supervisor for financial analysis in the GES group, Lau's duties included supervising employees and financial analysis of the B&G unit. Lau worked about 50-55 hours per week. B&G had over 70 cost centers, far more than any other unit, and the month-end financial package was almost 30 pages long. Lau also supervised Amy Harter, a Grade 14 financial analyst. Harter handled the Housekeeping unit, which took her 25-30 hours per week, and the QA unit, which took another 5 hours per week. From time to time, Lau also supervised interns.

¶ 7    Kevin Mix, another Grade 17 supervisor, was responsible for the Utilities unit, a full-time job. He also supervised Lucas Bowden, a Grade 14 financial analyst and CPA who handled the Maintenance and M/M units. Mix reported to Valerie Christophersen, a Grade 19 manager for

financial planning and analysis. Christophersen was a CPA who started at Abbott in 2001 and who began working in the GES unit in 2011.

¶ 8    This organizational structure existed through the end of 2012. Lau performed her work and received annual performance reviews from Covington, indicating that she had "achieved expectations." Abbott employee performance reviews had four descriptive ratings: expectations "not achieved," "partially achieved expectations," "achieved expectations," and "exceeded expectations."

¶ 9    In January 2013, Covington accepted a different position and Christophersen took over his duties, becoming Lau's supervisor. Lau's job duties did not change from 2012 to 2013. Lau asserts that her job performance also did not change from 2012 to 2013; Abbott disputes this.

¶ 10    In May 2013, Harter took a three-month leave of absence related to the birth of her child. In August 2013, about a week after Harter returned, Christophersen told Lau that Lau would no longer supervise Harter, who would instead report directly to Christophersen. (A few months after that, Harter left GES to transfer to Abbvie, a spin-off of Abbott.) Christophersen told Lau that her supervision over Harter had been removed so that Lau could focus on her responsibilities as the financial analyst for B&G. Thereafter, Lau did not supervise anyone and instead performed only the duties of a financial analyst. Eduardo Brito, who eventually became Christophersen's supervisor, testified that a Grade 17 supervisor was expected to supervise and manage someone.

¶ 11    At some point between mid-July and late September (the exact date is disputed), Christophersen verbally gave Lau a "mid-year" review. Lau asserts that this is the first time Christophersen told Lau that she found Lau's performance deficient in certain areas. Christophersen's notes from the meeting stated that the expectations for the first six months were "not completely met" and that certain "deliverables" (assignments) were not completed, specifically items for which Harter was responsible that Harter did not complete before taking leave. Thereafter, Christophersen and Lau began meeting weekly.

¶ 12    In February 2014, Christophersen completed annual performance reviews of Lau, Harter, and Bowden. Although Lau had supervised Harter for most of 2013, Christophersen took over the review process and changed the "achieved expectations" rating that Lau would have assigned Harter to "partially achieved expectations" (PA). Christophersen also gave Lau a rating of PA. This was the first time in 14 years of employment with Abbott that Lau had received a rating of PA. Both Lau and Harter believed that their low ratings were inaccurate and unfair, and both filed appeals of their ratings with the Abbott Employee Relations (ER) office.

¶ 13    Christophersen gave Bowden an overall rating for 2013 of "exceeds expectations." Lau and Harter testified that Christophersen was "overly friendly" with Bowden, joking and flirting with him in the office and attending after-work gatherings with him. Harter also testified that Christophersen allowed Bowden to avoid doing work he did not want to do.

¶ 14    In the 2013 annual review, Christophersen gave Lau a rating of 2.0 (adequate) in all sections, rating Lau at 3.0 ("effective") in only one subsection. Christophersen stated that "there were some key deliverables not fully understood, causing deadlines to be missed and requiring others in the group to take over and complete tasks." This comment apparently referred to deliverables for which Harter was responsible; Christophersen wrote that Lau did not understand and manage the impact of Harter's leave of absence or update Christophersen about problems caused by Harter's absence. In her written appeal, Lau stated that Harter had

started working on the deliverables but had unexpectedly gone into labor two weeks early while at work. Lau noted that she had taken on many of Harter's duties and had trained a summer intern to fill in for Harter at a level that was acceptable to the business unit involved (which Christophersen acknowledged). Christophersen also stated that Lau "was not able to meet the majority of the regular deliverables for her team." Lau disputed this, asserting that she had met all of the deadlines for most of her deliverables. Christophersen wrote that Lau put in "a significant amount of time, just to meet deadlines, leaving little or no time for analysis." Christophersen also rated Lau poorly on her supervisory skills. Christophersen testified that, as Lau was a Grade 17 supervisor, even after her supervisory duties had been removed, Christophersen expected her to provide "some kind of leadership mentoring," such as sharing knowledge with the group, pitching in to help out if someone was struggling, and helping people who came to her for guidance. Christophersen admitted that she did not in fact know whether people came to Lau for guidance or mentoring and that she was not aware of any occasion when Lau failed to share knowledge with the team or to pitch in to assist others. In terms of specific goals that had been identified, Christophersen agreed that Lau achieved 100% of them.

¶ 15    In Lau's appeal, she provided additional facts and explanations, challenging Christophersen's view of her performance. For instance, Lau noted that, although Christophersen criticized her abilities as a supervisor, she was given an intern to supervise during the summer of 2013, and her supervision and training of him was praised by Christophersen. Lau asserted that one deliverable that she missed was only assigned by Christophersen on a Friday when it was due the following Monday, and it involved much greater work for business units with many cost centers, such as B&G. Regarding the continuity problems caused by Harter's leave of absence, Lau noted that they were aggravated at the following month-end close when Christophersen pulled the wrong documentation, an error that Lau was not aware of until after the mid-year review. Lau had also undergone a "360" review (a process in which all of the persons with whom she worked rated her performance); Christophersen's rating of her was the most negative of any she received in that process.

¶ 16    As part of the appeal process, Lau was interviewed on February 14, 2014, by Natorshi Wilson, an ER employee. Lau told Wilson that Christophersen was "just biased" and nitpicked her work. Wilson did not ask Lau what she meant by "biased" and did not investigate further. On April 10, 2014, Julie Jansen (Christophersen's supervisor at the time) interviewed Lau about her appeal. Lau told Jansen that Christophersen treated her and Bowden "differently." Lau did not tell anyone at Abbott that she believed that Christophersen was discriminating against her specifically because of her sex, race, national origin, or age.

¶ 17    In April 2014, Lau asked Christophersen for permission to work from home one day because her child was sick. Christophersen denied Lau such permission and told Lau she would have to use a vacation day instead. In contrast, Christophersen granted Bowden permission to work from home more than once. Christophersen testified that she denied Lau permission because it was her policy not to grant such permission when a child was sick. However, she granted Harter permission to work from home when her child was sick.

¶ 18    Jansen interviewed Christophersen regarding Lau's appeal on April 21, 2014. That same day, Christophersen gave Lau a "coaching memo" regarding Lau's alleged performance deficiencies, which Christophersen testified had not improved since the 2013 review in February 2014. The coaching memo included a performance improvement plan with goals and

deadlines. Lau called ER about the memo and spoke with Sharon Larson, a senior ER specialist. Lau complained that Christophersen was constantly comparing her to Bowden and that Christophersen unfairly gave Bowden different deadlines for projects. Christophersen told Larson that she did provide Bowden with more flexibility with his due dates, but this was because he was handling more business units.

¶ 19 ER found that Christophersen's 2013 review of Harter did not appropriately evaluate Harter's performance, and her rating was changed to "achieved expectations." However, Jansen decided to uphold the PA rating for Lau. Jansen's write-up of her decision stated that she had interviewed Lau, Christophersen, and Harter, and she had reviewed Lau's appeal documents, Christophersen's "performance discussion documents," and an email from a colleague of Lau's about Lau's noncompletion of a particular deliverable. Jansen wrote that she observed a "significant gap in communication" between Christophersen and Lau, an observation that Lau agreed with. Jansen also reviewed examples of work provided by Lau and found that they lacked analysis and commentary, although Lau explained that she provided analysis verbally. Overall, Jansen's report reflected that she expected more of Lau based on her grade level. For instance, Jansen wrote that she was concerned that Lau, who had been meeting weekly with Christophersen since September, seemed to require much more supervision and guidance than Jansen would expect from a Grade 17 employee. Lau expressed concern that she was being evaluated against unfairly high expectations designed for employees who either were at Grade 18 and above or were "people leaders." (Christophersen had shown her a document about such expectations.) Jansen wrote that those expectations were appropriately applied to Lau because she was viewed as a "people leader" due to her supervision of Harter during the majority of 2013 and because "grade 17's in Finance are usually viewed as People Leaders even if they do not have any direct reports." The expectation was that Grade 17 employees (unlike Grade 16 senior financial analysts) were "providing leadership on projects, initiatives and/or key processes." Jansen acknowledged Lau's complaint that Christophersen treated Lau and Bowden differently, but Jansen viewed this as appropriate because of their different grade levels.

¶ 20 In early 2014, Mix moved out of GES and Bowden took over the financial analysis for Utilities in addition to handling Maintenance and M/M. Bowden continued handling these three units until May 2014, when Gary Docekal, a Grade 14 financial analyst, began working for GES. Docekal then took over the financial analysis for Maintenance and M/M. Docekal, like Lau and Bowden, reported directly to Christophersen.

¶ 21 On June 25, 2014, Christophersen gave Lau her mid-year review and told her that her performance was still not meeting expectations and needed improvement. Christophersen stated that Lau failed to submit work in a timely fashion and missed deadlines, and that she needed to improve her leadership skills as a supervisor. Christophersen also told Lau that her goals "appear[ed] to be on target."

¶ 22 Less than one month later, in July 2014, Christophersen told Lau that henceforth she would be handling three additional business units: Housekeeping, QA, and EO. According to Harter, Housekeeping required 25 to 30 hours of work per week and QA required an additional 5 hours per week. Lau was also assigned two additional consolidated financial packages to prepare each month; she testified that each of these took 4 to 5 hours to complete. At the time, Lau was already working 50 to 55 hours per week and was, in Christophersen's view, "struggling" to provide the financial analysis for B&G, and was not meeting expectations. Lau told

Christophersen that she was concerned that she could not handle all of the increased workload. Christophersen did not respond to these concerns.

¶ 23 Christophersen and Brito (who took over for Jansen as Christophersen's supervisor in mid-2014) testified that GES could not hire anyone new, but instead had to handle all of its work with its current staff: Lau, Bowden, and Docekal. However, Christophersen did not assign any additional business units to either of the males working in GES: Bowden, who was handling only Utilities, or Docekal. In Brito's opinion, Bowden had the potential to handle additional units, as shown by his high performance ratings in 2013 and 2014 and his ability to handle three business units between when Mix left and when Docekal arrived. At some point during 2014, Bowden was promoted to Grade 16, senior financial analyst. When asked why she did not assign even the small QA unit to either Bowden or Docekal, Christophersen said she did not know.

¶ 24 Lau went to ER about the additional workload. She spoke with Larson, saying that she believed that Christophersen was treating Bowden more favorably than her in terms of workload. Larson spoke with Christophersen, who defended her decision to give Lau more work by saying that she did not believe that Lau was working to her "full capacity." Larson did not take any further action, other than relaying this response to Lau. Larson later testified that she did not have any personal knowledge about Lau's job performance and that her understanding of Lau's work capacity was based solely on what Christophersen told her.

¶ 25 On August 20, 2014, Christophersen sent Lau a memo criticizing her for failing to complete a request for capital expenditure (RCE) that Lau received on August 13. Lau had started the RCE but had not completed it as of August 19 due to other work deadlines and a brief (1.5 days) vacation. Christophersen believed that Lau should have completed it or at least told Christophersen that it was not yet finished. However, there was no specific deadline for completing RCEs.

¶ 26 Lau attempted to perform the additional work assigned to her but, as she had feared, she was unable to do so by herself. She asked Christophersen for help, but Christophersen did not give her any help. (Abbott does not dispute either of these statements.) Harter and Lau observed Christophersen help Bowden with his work. Christophersen did not allow Lau to attend one of her scheduled training classes, out of concern that Lau would not be able to complete her deliverables. She allowed Bowden to attend all of his scheduled training classes.

¶ 27 On September 15, 2014, Christophersen gave Lau a second "coaching memo." Four days later, Lau met with Brito. Lau told Brito that she believed that Christophersen was trying to get her fired. Brito told Lau that she was "meeting all of her deliverables" but was not meeting her "competencies" as a Grade 17 supervisor. As for certain monthly payroll models that Christophersen was requiring Lau to do, Brito stated that he did not see why the finance staff was doing those, but he would leave it up to Christophersen. Brito followed up with Christophersen after the meeting, discussing how Christophersen could "ensure that [her] tone and treatment was as fair and neutral as possible."

¶ 28 On October 31, 2014, Christophersen removed Lau's responsibility for two of the business units assigned to her in July 2014 and told her it was a "performance issue."

¶ 29 On November 4, 2014, Christophersen sent a draft memo to Larson, listing justifications for firing Lau. In the draft, Christophersen asserted that Lau's attitude was unprofessional; Lau had complained "about the workload being unfair to her peers, and to her manager." Larson deleted that language from the final version of the memo.

¶ 30    On December 8, 2014, Christophersen told Lau that she was being terminated. The termination decision was made by Brito and Larson, based on Christophersen's recommendation. The documentation of the termination stated that Lau was terminated because she continued to miss deliverables, her work contained inaccurate data, and her commentary required reworking. Further, she did not "fully demonstrate active leadership" and did not follow up with Christophersen as expected.

¶ 31    After Lau was terminated, Bowden took over her duties with respect to the B&G unit and retained them until his departure from GES in 2016. According to Brito, this fact showed that Bowden had had the capacity to absorb additional work in 2014.

¶ 32    Lau found a new job about five months after she was terminated from Abbott. She switched jobs in June 2016, joining the finance department of a business at a higher salary than she earned at Abbott.

¶ 33    Lau filed a charge of discrimination with the Illinois Department of Human Rights (Department) on May 18, 2015. The charge alleged that Abbott discriminated against her on the basis of her sex, race, national origin, age, or disability, and further alleged unlawful retaliation. (Lau later abandoned the claim of disability-related discrimination.) In August 2016, the Department dismissed the charge. Lau timely filed a complaint of discrimination and retaliation in the trial court. Lau sought damages not only for lost wages and benefits but also for emotional distress caused by the alleged discrimination and retaliation.

¶ 34    Abbott moved for summary judgment, and the trial court granted that motion. Lau now appeals from that decision, contending that she presented enough evidence that summary judgment should have been denied.

¶ 35                                    II. ANALYSIS
¶ 36                          A. Applicable Legal Standards
¶ 37    A motion for summary judgment is properly granted only where the pleadings, depositions, admissions, and affidavits establish that no genuine issue of material fact exists and that the moving party is entitled to judgment as a matter of law. 735 ILCS 5/2-1005 (West 2016); *Adams v. Northern Illinois Gas Co.*, 211 Ill. 2d 32, 43 (2004). "In determining whether a genuine issue as to any material fact exists, a court must construe the pleadings, depositions, admissions, and affidavits strictly against the movant and liberally in favor of the opponent." *Id.* Material facts are facts that might affect the outcome of the case under the applicable substantive law. *GreenPoint Mortgage Funding, Inc. v. Hirt*, 2018 IL App (1st) 170921, ¶ 17 (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). Summary judgment should not be entered where material facts are disputed or where the material facts are undisputed but reasonable persons might draw divergent inferences from those facts. *Adams*, 211 Ill. 2d at 43. In reviewing a trial court's grant of summary judgment, we do not assess the credibility of the testimony presented but, rather, determine only whether the evidence presented was sufficient to create an issue of material fact. See *Jackson v. Graham*, 323 Ill. App. 3d 766, 779 (2001). We review the grant of summary judgment *de novo*. *Adams*, 211 Ill. 2d at 43.

¶ 38    Lau's complaint alleged discrimination and retaliation that violated various provisions of the Illinois Human Rights Act (Act) (775 ILCS 5/1-101 *et seq.* (West 2016)). Although this is an Illinois statute, in assessing such claims, we are guided not only by Illinois case law but also by (1) federal case law relating to federal anti-discrimination statutes, including Title VII of the

Civil Rights Act of 1964 (42 U.S.C. § 2000e-2(a)(1) (2012)), which prohibits discrimination on the basis of sex, race, and national origin, among other things; (2) the Age Discrimination in Employment Act of 1976 (ADEA) (29 U.S.C. § 621 *et seq.* (2012)); (3) and the anti-retaliation provisions of those statutes. See *Zaderaka v. Illinois Human Rights Comm'n*, 131 Ill. 2d 172, 178 (1989) (claims under the Act are to be evaluated in accordance with federal decisions interpreting federal anti-discrimination laws).

¶ 39    To withstand a motion for summary judgment, a plaintiff must present "evidence [that] would permit a reasonable factfinder to conclude that the plaintiff's race, ethnicity, sex, religion, or other proscribed factor caused[1] the discharge or other adverse employment action." *Ortiz v. Werner Enterprises, Inc.*, 834 F.3d 760, 765 (7th Cir. 2016). In *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), the United States Supreme Court outlined a burden-shifting approach for proving employment discrimination cases. Under that approach, a plaintiff must produce enough evidence to establish a *prima facie* case that she was a member of a protected class and that she was treated less favorably than someone who was not in the protected class "under circumstances which give rise to an inference of unlawful discrimination." *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 253 (1981) (explaining the *McDonnell Douglas* approach). If the plaintiff can do this, the burden of production shifts to the employer to articulate a legitimate, nondiscriminatory reason for taking the action it did. *Id.* Finally, if the employer is able to articulate such a reason, the plaintiff "must then have the opportunity to prove" that the reason offered by the employer was not its true reason, but rather was a pretext for discrimination. *Id.* The Seventh Circuit has cautioned that courts considering whether a plaintiff has met her burden must not conduct overly narrow inquiries that distinguish direct from indirect evidence of discriminatory intent: "[e]vidence must be considered as a whole, rather than asking whether any particular [type or] piece of evidence proves the case by itself." *Ortiz*, 834 F.3d at 765.

¶ 40    A *prima facie* case under the *McDonnell Douglas* approach requires evidence that (1) the plaintiff is a member of a protected class, (2) she was meeting her employer's legitimate employment expectations, (3) she suffered an adverse employment action, and (4) she was treated less favorably than a similarly situated person who was not a member of the protected class. *Barbera v. Pearson Education, Inc.*, 906 F.3d 621, 629 (7th Cir. 2018). However, these components are "not inflexible" and may vary depending on the facts of the case: " '[T]he specification above of the *prima facie* proof required from respondent is not necessarily applicable in every respect in differing factual situations.' " *Burdine*, 450 U.S. at 253 n.6 (quoting *McDonnell Douglas*, 411 U.S. at 802 n.13). Overall, "[t]he burden of establishing a *prima facie* case of disparate treatment is not onerous." *Id.* at 253.

¶ 41    Although it occupies a prominent place in the law of employment discrimination, the *McDonnell Douglas* burden-shifting approach is not a requirement in employment

---

[1]The nature of the causal link that must be shown differs somewhat depending on the type of claim. For claims of discrimination based on the protected classes listed in Title VII, it is sufficient to show that membership in that class was one of the motivating factors behind the adverse employment action. See 42 U.S.C. § 2000e-2(m) (2012). For retaliation claims and claims under the ADEA, however, a plaintiff must meet the higher "but-for" causation standard—that is, she must show that the adverse action would not have been taken if she were not a member of the protected class. *University of Texas Southwestern Medical Center v. Nassar*, 570 U.S. 338, 334-47 (2013) (retaliation claims under Title VII); *Gross v. FBL Financial Services, Inc.*, 557 U.S. 167, 177-78 (2009) (ADEA claims).

discrimination claims. "[T]he original purpose of *McDonnell Douglas* \*\*\* was to outline a series of steps that, if satisfied, would support a plaintiff's right to reach the trier of fact." *Morgan v. SVT, LLC*, 724 F.3d 990, 997 (7th Cir. 2013). The *McDonnell Douglas* approach is simply "a means of organizing, presenting, and assessing circumstantial evidence in frequently recurring factual patterns found in discrimination cases"; it is "not the only way to assess circumstantial evidence of discrimination." *David v. Board of Trustees of Community College District No. 508*, 846 F.3d 216, 224 (7th Cir. 2017). "In adjudicating a summary judgment motion, the question remains: has the non-moving party produced sufficient evidence to support a jury verdict of intentional discrimination?" *Id.*

¶ 42                        B. Discrimination Claims

¶ 43    In her complaint, Lau alleged that Christophersen treated her less favorably than other employees by, among other things, assigning her additional work, holding her to a higher performance standard, and evaluating her more harshly, leading to her eventual termination. Lau alleged that Christophersen was motivated by animus on the basis of Lau's sex, race, national origin, or age. (Lau also alleged that she complained of Christophersen's discriminatory actions and that she was retaliated against for those complaints through actions, including her termination. We address the retaliation claim separately.)

¶ 44    Abbott moved for summary judgment on Lau's discrimination claims on the grounds that Lau did not show the existence of a similarly situated employee who was treated more favorably than her, and even if she did, she did not produce any evidence that would cast doubt on the nondiscriminatory reasons for her termination that Abbott offered (the alleged deficiencies in her job performance). Both of these arguments are premised on the application of the *McDonnell Douglas* approach. Although Lau responds to these arguments, she also asserts that she did not invoke *McDonnell Douglas* as the sole applicable legal framework and that her claims must be evaluated as a whole if we find them deficient under *McDonnell Douglas*. We begin with Abbott's arguments based on *McDonnell Douglas*.

¶ 45                  1. *McDonnell Douglas*—Similarly Situated

¶ 46    The fourth prong of the *McDonnell Douglas* framework requires a plaintiff to produce evidence that she was treated less favorably than a similarly situated employee who was not a member of the protected class. *Barbera*, 906 F.3d at 629. "The similarly-situated analysis calls for a 'flexible, common-sense' examination of all relevant factors." *Coleman v. Donahoe*, 667 F.3d 835, 846 (7th Cir. 2012) (quoting *Henry v. Jones*, 507 F.3d 558, 564 (7th Cir. 2007)).

> "There must be 'enough common factors . . . to allow for a meaningful comparison in order to divine whether intentional discrimination was at play.' *Barricks v. Eli Lilly and Co.*, 481 F.3d 556, 560 (7th Cir. 2007). \*\*\* In the usual case a plaintiff must at least show that the comparators (1) 'dealt with the same supervisor,' (2) 'were subject to the same standards,' and (3) 'engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them.' *Gates v. Caterpillar, Inc.*, 513 F.3d 680, 690 (7th Cir. 2008), quoting *Snipes v. Illinois Department of Corrections*, 291 F.3d 460, 463 (7th Cir. 2002). This is not a 'magic formula,' however, and the similarly-situated inquiry should not devolve into a mechanical, 'one-to-one mapping between employees.' *Humphries* [*v. CBOCS West, Inc.*, 474 F.3d 387, 405 (7th Cir. 2007)]." *Id.* at 847.

"Whether a comparator is similarly situated is 'usually a question for the fact-finder,' and summary judgment is appropriate only when 'no reasonable fact-finder could find that plaintiffs have met their burden on the issue.' " *Id.* at 846-47 (quoting *Srail v. Village of Lisle*, 588 F.3d 940, 945 (7th Cir. 2009)).

¶ 47        Lau identifies Bowden and Docekal (both of whom were white, male, and younger) as two Abbott employees who were similarly situated to her. Both worked as financial analysts in the GES division, and both reported directly to Christophersen beginning in 2014. Lau claims that Christophersen treated her worse than Bowden and Docekal, giving her (but not them) significantly more work to do in July 2014, despite Christophersen's view that Lau was struggling with her previous duties. Lau also claims that Christophersen held her to higher expectations and unfairly gave her lower reviews, all of which led to her termination.

¶ 48        Abbott argues that Bowden and Docekal were not comparable to Lau, as they held lower, nonsupervisory positions, and the expectations for someone with Lau's experience (14 years) and grade level (17) were higher than for Bowden (first Grade 14, then 16) or Docekal (new to GES and Grade 14 throughout).[2] (Abbott also argues that Lau had performance deficiencies that Bowden and Docekal did not; we address this contention in our discussion of pretext, below.) Lau responds that, once Christophersen stripped her of her supervisory duties over Harter in August 2013, Lau was serving only as a financial analyst. She asserts that the differing grade levels were irrelevant after that point because the financial analysis that she, Bowden, and Docekal were expected to perform for their assigned business units was essentially the same. She also notes that Brito testified that Bowden could have handled the additional work that Christophersen chose to assign to Lau, suggesting that Bowden and Lau were in fact comparable.

¶ 49        As we have noted, the issue of whether particular employees are similarly situated is generally a question for the fact finder to resolve. Here, the similarities between Lau and her comparators—that they were doing the same work, in the same unit, under the same supervisor—are relevant to the issue of how Christophersen viewed and treated subordinates. Further, in 2013 Christophersen also rated Harter, another female subordinate who had the same grade level (14) as Bowden, as PA, a rating that was later overturned as unjustified. This could suggest that it was not grade level that caused Christophersen's low evaluations of Lau.

¶ 50        Abbott argues that, as a matter of law, employees of different grade levels cannot be similarly situated, but the cases it cites involve proposed comparators who had other differences as well from the plaintiffs in those cases. See *Patterson v. Indiana Newspapers, Inc.*, 589 F.3d 357, 366 (7th Cir. 2009) (employer's statement of facts deemed undisputed through plaintiff's failure to contest it; and although proposed comparators held different positions, "most important[ ]" factor was lack of evidence that comparators and plaintiff committed similar violations of workplace rules); *Hoffman-Dombrowski v. Arlington International Racecourse, Inc.*, 254 F.3d 644, 651 (7th Cir. 2001) (in failure-to-promote claim,

---

[2]Abbott also argues that Lau forfeited her ability to use Docekal as a comparator, because, in her deposition, she testified that Bowden was the only similarly situated employee. This is not quite right: Lau testified that her references to similarly situated employees had "mainly" to do with Bowden. Moreover, Lau cited Docekal as a comparator in her response to the motion for summary judgment, and thus the issue of whether he was a proper comparator was fully briefed in the trial court. Accordingly, we do not view Lau as having forfeited the use of Docekal as a comparator.

proposed comparator initially held a higher position than plaintiff, so desired position was a lateral move for him but would have been a promotion for plaintiff).

¶ 51    In opposition, Lau cites cases in which courts specifically held that a difference in seniority or grade level was not dispositive of whether someone was an appropriate comparator. See *Coleman*, 667 F.3d at 848 (collecting cases). Indeed, we note that, in the seminal case of *Burdine*, the plaintiff was the former supervisor of the comparator. See *Burdine*, 450 U.S. at 250-51. We therefore reject Abbott's argument that Lau cannot prevail on this issue as a matter of law. Moreover, there is sufficient conflicting evidence to raise a factual dispute over whether Lau and Bowden (and perhaps Docekal) were similarly situated but treated differently. Accordingly, the trial court erred in finding that Lau had not made out a *prima facie* case of discrimination.

¶ 52                        2. *McDonnell Douglas*—Pretext

¶ 53    Under the *McDonnell Douglas* burden-shifting approach, when a plaintiff has made out a *prima facie* case, a presumption arises that, if not rebutted, could lead to a judgment in her favor on her discrimination claims. *Burdine*, 450 U.S. at 254. An employer may rebut this presumption by articulating a legitimate, nondiscriminatory reason for its action. *Id.* at 257. Once the employer offers such a reason, the presumption drops from the case and the plaintiff "must have the opportunity to demonstrate that the proffered reason was not the true reason for the employment decision." *Id.* at 256. To avoid the entry of summary judgment, the plaintiff must present evidence raising an inference that the adverse action was motivated, at least in part, by an improper discriminatory motive. The plaintiff can do so by, among other things, pointing to evidence suggesting that the employer's proffered reason is pretextual and unworthy of credence. *Id.* The issue of whether the employer's stated reason is a pretext is a question of fact. *Zaderaka*, 131 Ill. 2d at 180.

¶ 54    As part of its argument that Lau was not similarly situated to Bowden or Docekal, Abbott argues that Lau had a documented record of poor performance (at least during 2013 and 2014) that Bowden and Docekal did not. Those same alleged performance deficiencies are the nondiscriminatory reason that Abbott proffers as its justification for firing Lau. We therefore consider this assertion in the context of whether Lau has presented enough evidence to require that a jury decide whether this reason was genuine or a pretext masking discriminatory decision-making. See *Khowaja v. Sessions*, 893 F.3d 1010, 1015 (7th Cir. 2018) (the similarly situated and pretext inquiries often overlap); *Gordon v. United Airlines, Inc.*, 246 F.3d 878, 886 (7th Cir. 2001) (issue of whether an employee was performing to the level reasonably expected by the employer overlapped with the issue of pretext; court addressed that issue in the pretext analysis).

¶ 55    "Pretext involves more than just faulty reasoning or mistaken judgment on the part of the employer." *Argyropoulos v. City of Alton*, 539 F.3d 724, 736 (7th Cir. 2008). Rather, a pretext is "a phony reason for some action." *Russell v. Acme-Evans Co.*, 51 F.3d 64, 68 (7th Cir. 1995). A plaintiff can raise a sufficient inference of pretext to survive summary judgment by showing that the employer's stated reason is implausible or contradictory. *Coleman*, 667 F.3d at 852.

¶ 56    Viewing the evidence in the light most favorable to Lau, as we must, we find that she has presented enough evidence from which a rational fact finder could determine that her alleged performance deficiencies were a pretext for discriminatory animus on the part of

Christophersen. It is undisputed that Lau had received favorable performance reviews for the 12 years before Christophersen became her supervisor and that her job duties did not change between 2012 (when she received a rating of "achieved expectations") and 2013 (when she first received a PA rating from Christophersen). Of course, as Abbott points out, the key question is how Lau was performing immediately before she was terminated, and prior evaluations, standing alone, are insufficient to prove pretext. See *Peele v. Country Mutual Insurance Co.*, 288 F.3d 319, 329 (7th Cir. 2002). Nevertheless, her previous work record is one relevant factor that may be considered. *Culver v. Gorman & Co.*, 416 F.3d 540, 549 (7th Cir. 2005). An inference of bias also arises from the facts that Christophersen rated both of her male subordinates (Bowden and Docekal) favorably, while rating both of her female subordinates (Lau and Harter) unfavorably, and that her low rating of Harter was later overturned as unjustified. In addition, Harter echoed Lau's testimony that Christophersen treated Bowden more leniently with respect to deadlines and performance.

¶ 57    But perhaps the most compelling evidence that Lau's job performance was not the true reason for her termination comes from Christophersen's own actions and words. Christophersen's PA rating of Lau in 2013 rested in part on the justification that Lau was not acting as a "people leader." However, Christophersen had removed Lau's supervisory job duties, thereby making it difficult for her to show competence in this area. Moreover, Christophersen's low rating of Lau in this area was contradicted by Lau's supervision of an intern—work that was praised by others and that Christophersen herself commended. Christophersen also stated that, even if a "people leader" did not have any direct reports, she expected such a person to demonstrate mentoring skills by sharing knowledge with the group, pitching in to help out if someone was struggling, and helping people who came to her for guidance. But Christophersen admitted that she did not know whether people in fact came to Lau for guidance or mentoring, and she was not aware of any occasion when Lau failed to share knowledge with the team or to pitch in to assist others.

¶ 58    Even more significantly, shortly after giving Lau a poor review and placing her under a performance improvement plan, Christophersen increased her workload substantially, assigning her three more business units to handle and another two monthly consolidated financial packages to prepare. Harter testified that the additional business units represented an additional 30 to 35 hours of work per week. Christophersen testified that she assigned Lau this extra work because she believed that Lau should be able to handle it, both in terms of her capacity and because of her grade level. However, Christophersen also stated that she believed that Lau was "struggling" to adequately perform her work even without the additional duties, and she did not know why she did not assign even the small QA unit to either Bowden or Docekal. A reasonable juror could conclude that Christophersen was setting Lau up to fail by assigning her extra work that Christophersen knew she could not handle. Taken together, all of these admissions and inconsistencies raise a reasonable inference that Christophersen was seeking out reasons to rate Lau's performance as poor rather than honestly evaluating that performance.

¶ 59    Abbott argues that Lau cannot show that the extra work she received was excessive because a single employee later became responsible for all seven business units in GES. (This occurred a few years after the events at issue here.) Lau responds that, according to Brito, this occurred only after GES underwent restructuring that eliminated or reallocated many of its

former responsibilities. Given the factual disputes on the relevancy of this point, we do not find it dispositive.

¶ 60　　Abbott also argues that Lau merely "disagreed with" the performance reviews and coaching memos, but she did not produce any evidence suggesting that they were inaccurate. This is incorrect. Lau identified numerous factual disputes regarding specific criticisms leveled in those reviews and coaching memos, including whether she met the majority of her regular deliverables, whether certain work had been done, whether certain analysis was communicated to the business groups she worked with, and whether Harter could have assisted her by taking on certain expense approvals. For all of these reasons, Abbott has not established that Lau's evidence of pretext is fatally deficient.

¶ 61　　　　　　　　　　　　　3. Evidence as a Whole

¶ 62　　Lau argues that she need not prove her case through the *McDonnell Douglas* framework and that courts may also simply place all of the evidence submitted by a plaintiff into a single pile and evaluate it as a whole. See *Ortiz*, 834 F.3d at 766. The trial court misapprehended this argument, stating that Lau's claims must be evaluated under the *McDonnell Douglas* burden-shifting approach because she had not presented any evidence to "directly show" discriminatory intent. This statement erroneously conflated the "evidence as a whole" approach with "direct evidence" (evidence that by itself proves a point without the need to draw inferences, as distinct from circumstantial evidence). But all "[r]elevant evidence must be considered" regardless of whether "it can be labeled 'direct' or 'indirect.' " *Id.* at 765. Thus, Lau was entitled to simply list all of her evidence of discriminatory intent—both direct and circumstantial—and ask the court to consider whether it raised a sufficient inference of such intent to demonstrate a dispute of material fact requiring the denial of the motion for summary judgment.

¶ 63　　On appeal, Lau argues that her evidence should be evaluated as a whole if we find that she did not identify any proper comparators. As we have found the evidence she produced sufficient to withstand summary judgment under the *McDonnell Douglas* approach, however, we need not reconsider the evidence as a whole—which would yield a similar result at any rate.

¶ 64　　　　　　　　　　　　　C. Retaliation Claim

¶ 65　　To succeed on a claim of retaliation, a plaintiff must show that she engaged in a statutorily protected activity, that a materially adverse action was taken against her, and that there is a causal link between the two. *Skiba v. Illinois Central R.R. Co.*, 884 F.3d 708, 718 (7th Cir. 2018). Here, Lau alleged that, after she complained that Christophersen was biased against her, she was given substantially more work to perform (more than she could handle) and then was terminated.

¶ 66　　Abbott argues that it is entitled to summary judgment on this claim because Lau's complaints of "bias" and "unfair treatment" were insufficient as a matter of law to qualify as protected activity under Title VII. It is undisputed that Lau never specifically mentioned discrimination on the basis of sex, race, national origin, or age in her complaints. It is also undisputed that Lau complained that Christophersen was "biased" and treated her less favorably than Bowden in a variety of ways. The question is whether these complaints were legally sufficient to qualify as protected activity.

¶ 67    Protected activity includes internal complaints to managers or other appropriate persons. See *Burks v. Wisconsin Department of Transportation*, 464 F.3d 744, 758 (7th Cir. 2006). However, the substance of the complaint must be sufficient to put the employer on notice that the plaintiff reasonably believes that prohibited discrimination has occurred. Although no particular "magic words" are required (*Broderick v. Donaldson*, 437 F.3d 1226, 1232 (D.C. Cir. 2006)), " 'the complaint must indicate [that] discrimination occurred because of sex, race, national origin, or some other protected class.' " *Skiba*, 884 F.3d at 718 (quoting *Tomanovich v. City of Indianapolis*, 457 F.3d 656, 663 (7th Cir. 2006)). "Merely complaining in general terms of discrimination or harassment, without indicating a connection to a protected class or providing facts sufficient to create that inference, is insufficient." *Tomanovich*, 457 F.3d at 663.

¶ 68    Under these standards, Lau's complaint that Christophersen was "just biased" (which was made in connection with statements that Christophersen was overly critical of Lau's work) would not be perceived by a reasonable person as a complaint that Christophersen was discriminating against Lau on the basis of Lau's sex, race, national origin, or age. Even coupled with Lau's complaints that Christophersen treated Bowden more favorably, this vague complaint of "bias" was insufficient to put Abbott on notice that Lau was alleging that Christophersen was violating the Act. Lau cannot sustain her claim that Abbott retaliated against her for complaining about sex, race, national origin, or age discrimination when she cannot show that she made any such complaint.

¶ 69    Lau argues that there is a factual dispute over whether Abbott in fact viewed her broad complaint of "bias" as referring to the type of conduct barred by the Act. Specifically, Wilson (the ER employee who interviewed Lau regarding her appeal of the 2013 PA rating) testified in deposition that she interpreted this term "loosely" as a complaint that Christophersen did not like Lau and was being generally unfair to her, not as an accusation of discrimination that should be investigated. However, Larson (a more senior ER staff person) testified that she would want to investigate further if she learned that an employee viewed her supervisor as biased. Lau also points out that in April 2014 she told Larson that Christophersen treated Bowden more leniently with regard to work deadlines.

¶ 70    The difficulty with Lau's comments is that they are vague—vague enough that Wilson testified she did not understand the complaint of bias to mean the type of conduct that would violate the Act. Although Larson testified that she might have interpreted Lau's assertion of "bias" differently than Wilson, there is no evidence that Larson was previously aware of this particular statement. And when Lau told Larson that Christophersen treated Bowden more leniently, Larson investigated but believed Christophersen's explanation that the difference in treatment was based on Bowden's workload. The legal standard for a claim of retaliation requires that the complaint be reasonably understood as alleging discrimination on the basis of a prohibited classification. *Skiba*, 884 F.3d at 718. Without a more explicit complaint that Christophersen was motivated by a discriminatory animus against Lau, these complaints are insufficient to show a factual dispute over whether Abbott reasonably should have been aware that Lau was asserting that Christophersen's conduct violated the Act.

Lau also argues that her complaint of "bias" was equivalent to a claim of discrimination, as these two terms are often viewed as synonymous and used interchangeably. But both of these terms can also refer generally to favoritism, or differentiation based on characteristics that would not violate the Act. Thus, even an assertion of discrimination is insufficient if it is not

tied to some indication that a prohibited classification is involved. See *Tomanovich*, 457 F.3d at 663. Accordingly, we affirm the trial court's grant of summary judgment on the retaliation claim.

¶ 71                                    III. CONCLUSION

¶ 72         For the reasons stated, the judgment of the circuit court of Lake County, granting summary judgment in favor of Abbott, is affirmed as to Lau's retaliation claim and reversed as to the remaining claims. We remand for further proceedings consistent with this decision.

¶ 73         Affirmed in part and reversed in part.

¶ 74         Cause remanded.