2020 IL App (1st) 192408

FIRST DISTRICT
FOURTH DIVISION
June 25, 2020

No. 1-19-2408

|  |  |  |
|---|---|---|
| MATTHEW THAI and TUYETHA DINH, individually and as next friends of J.T., a minor, | ) ) ) | Appeal from the Circuit Court of Cook County |
|  | ) |  |
| Plaintiffs-Appellants, | ) |  |
|  | ) |  |
| v. | ) | No. 17 L 8840 |
|  | ) |  |
| TRIUMVERA 600 NAPLES COURT CONDOMINIUM ASSOCIATION, an Illinois not-for-profit corporation, JASON NEUBERGER, MARGARET HOCK, THOMAS BYRNE, MICHELE ROSE, TRACY HOBAN, and JUELE BLANKENBURG, | ) ) ) ) ) | Honorable Allen P. Walker, Judge Presiding. |
|  | ) |  |
|  | ) |  |
| Defendants-Appellees. | ) |  |

JUSTICE REYES delivered the judgment of the court, with opinion.
Presiding Justice Gordon and Justice Lampkin concurred in the judgment and opinion.

## OPINION

¶ 1    Plaintiffs Matthew Thai, Tuyetha Dinh, and J.T., one of their four minor children

(collectively plaintiffs), filed a six-count amended complaint against the Triumvera 600 Naples

Court Condominium Association (association) and its board members Jason Neuberger,

Margaret Hock, Thomas Byrne, Michele Rose, Tracy Hoban, and Juele Blankenburg

(collectively the board) alleging, *inter alia*, breach of fiduciary duty, defamation, invasion of

privacy, and violations of the Illinois Human Rights Act (Act) (775 ILCS 5/1-101 *et seq.* (West 2016)) for familial status discrimination, national origin discrimination, and retaliation.  These counts were based on plaintiffs' allegations that they endured severe emotional distress and harassment from the association and its board members due to their Vietnamese national origin and familial status.  The trial court granted summary judgment in favor of defendants on plaintiffs' claims under the Act.  The matter then proceeded to trial on the counts for breach of fiduciary duty, defamation, invasion of privacy.  The jury returned a verdict in favor of plaintiffs on the defamation and invasion of privacy counts against the association in the amount of $60,000 plus costs.

¶ 2     On appeal, plaintiffs claim that the trial court erred in granting summary judgment in favor of defendants on the retaliation count.  According to plaintiffs, the association filed a lawsuit in chancery against them in retaliation after learning that plaintiffs had filed a charge under the Act with the Illinois Department of Human Rights (IDHR).  Plaintiffs further assert that while defendants did set forth a legitimate nondiscriminatory reason for filing the chancery action, namely that they did so in order to enforce the terms of the association's governing documents and to ensure that plaintiffs' unit was in good repair and had proper flooring, the evidence demonstrated that a genuine issue of material fact existed as to whether this legitimate nondiscriminatory reason was pretext for a retaliatory motive.  Plaintiffs thus conclude that the trial court erred in granting summary judgment in defendants favor on this count.  For the reasons that follow, we reverse the decision of the trial court and remand the matter for further proceedings.

¶ 3                                BACKGROUND

¶ 4     According to the pleadings, depositions, and affidavits filed in this matter, Matthew Thai

was the record owner of 600 Naples Court, unit 308, in Glenview, Illinois. He resided therein with his wife, Dinh, and his four minor children from 2014 until October 2017. In 2015, certain neighbors complained to the board about the children playing and making noise. Plaintiffs attended a subsequent board meeting and, based on that conversation, instituted some measures to reduce the impact of their children living in a condominium setting. Namely, plaintiffs imposed specific disciplinary rules for the children and installed thick foam padding in the area of unit 308 where the children would play and installed carpeting in the bedroom. Subsequently, plaintiffs received no adverse communications or complaints from the association regarding noise violations in 2016.

¶ 5      In January 2017, Neuberger became the board president. Neuberger was the owner of unit 208 which was situated directly below plaintiffs' unit. Beginning from the time Neuberger assumed the presidency, and continuing until plaintiffs moved out, Neuberger engaged in what plaintiffs alleged was a pattern of harassing and disparate treatment against them and their children, which included frequent pounding on their door and their floor.

¶ 6      Then, in January 2017, the association posted minutes of its January 10, 2017, board meeting wherein plaintiffs' children were referred to as "serial noise violators" and stated, "Legal action will need to be taken if this is not remedied in the near future." On January 25, 2017, Neuberger issued a "warning letter from the Board" to unit 308 complaining that "excessive and consistently disturbing noise *** comes from your unit."

¶ 7      Later that month, the association shut the water off in the building to clean the pipes. As a result of this plumbing work, plaintiffs' unit flooded and their kitchen sink became inoperable. Plaintiffs contacted the association requesting that the issue be corrected. A plumbing contractor hired by the association addressed the issue but, unbeknownst to plaintiffs and without their

consent, photographs were taken of their unit which demonstrated it was in disarray with unwashed pots, pans, and dishes on the counter and boxes piled up around the room. Plaintiffs alleged that these photographs were taken at the behest of Neuberger and the association. These photographs resulted in the association having its legal counsel send Thai a letter referencing the photographs and requesting that unit 308 be cleaned and thereafter inspected by the association. Subsequent to its board meeting held on February 14, 2017, the association publicly posted the minutes which specifically referenced unit 308 and stated, "The excessive debris in the unit (documented by the plumber's photos during a repair) is a potential DCFS issue also. Action on this concern is suggested if we do not receive cooperation on the noise and debris." Two days later, plaintiffs received a " 'notification of a suspected child abuse and/or neglect' from the Illinois Department of Children and Family Services [(DCFS)]." As a result of this report, plaintiffs were investigated by DCFS. Ultimately, DCFS determined the report was unfounded.

¶ 8     On April 11, 2017, a board meeting was held wherein the defendants discussed and approved three $50 fines against unit 308. The fines were for excessive noise, moving out in contravention of the rules and regulations, and failure to allow the association to inspect the condition of the unit. At that time, the rules and regulations provided that, upon being fined, the unit owner shall receive written notice as well as information on a hearing and appeal. The notice was deemed properly served on the unit owner when deposited in the U.S. mail. On April 12, 2017, Neuberger and the board secretary Rose worked together to draft the notice to Thai which provided that the hearing would take place at the next board meeting on April 25, 2017. It is unclear from the record the manner in which Thai was provided service of the notice.

¶ 9     In a text message exchange on April 20, 2017, Rose and Neuberger discussed proper service of the notice and expressed concern over whether unit 308 received proper notice. They

determined that if Thai did not attend the hearing they would reissue the notice in accordance with the rules and regulations. Specifically, Neuberger stated, "we rewrite the letter for the next meeting and mail it *** give him another opportunity and do it by the book." Thai did not receive the notice and therefore did not appear at the board meeting on April 25, 2017.

¶ 10 Meanwhile, prior to the last board meeting, on April 21, 2017, plaintiffs had filed a charge with the IDHR alleging the association and its board members discriminated against them based on their national origin and familial status. The association was notified of the charge through their counsel on April 26, 2017. On May 4, 2017, Neuberger sent an email to the board members in which he stated the following:

> "They are 100% wrong and have zero evidence of their slanderous false accusations of discrimination. The idea that the part at fault (308) can file a false complaint and place our board on the defensive is laughable. They have zero evidence and I plan on moving forward with our lawyer. I feel time is of the essence. They have not perfected (signed) their complaint yet, and we have a case per our lawyer and overwhelming support of the board to address this legally."

At the May 9, 2017, board meeting, the board voted to initiate the chancery lawsuit against plaintiffs.

¶ 11 Thereafter, on June 7, 2017, the chancery action was filed. In this cause of action, the association sought injunctive relief in the form of cleaning and the installation of adequate soundproofing material beneath the flooring of unit 308. The association further sought the recovery of the $150 in fines as well as attorney fees.

¶ 12 In August 2017, plaintiffs filed the six-count complaint at issue here against defendants in law division alleging breach of fiduciary duty, defamation, invasion of privacy, national origin

discrimination under the Act, familial status discrimination under the Act, and retaliation under section 6-101(A) of the Act (775 ILCS 5/6-101(A) (West 2016)). Plaintiffs later amended their complaint to add their minor son, J.T., as a plaintiff.

¶ 13 Defendants answered the complaint and later filed a motion for summary judgment. Pertinent to this case, defendants argued that summary judgment should be granted in their favor on count six of plaintiffs' complaint. Defendants maintained that plaintiffs could not establish one of the elements of a *prima facie* case of retaliation, namely a causal link between the chancery action and the filing of the IDHR charge. Regardless, defendants asserted that they had a legitimate nondiscriminatory reason for filing the chancery action; the association had a fiduciary duty to enforce its rules and regulations to ensure that unit 308 was in good repair and had proper flooring.

¶ 14 In response, plaintiffs argued that defendants had no intention of filing the chancery lawsuit until after they had made the IDHR charge. While defendants acknowledged that defendants articulated a legitimate nondiscriminatory reason for filing the chancery lawsuit, plaintiffs maintained this was merely a pretext. Plaintiffs supported this position with evidence from the record that: (1) Neuberger and Rose admitted they did not provide Thai with proper notice of the hearing on the fines issued and intended on resending him proper notice in accordance with the association's rules and regulations if he failed to attend the hearing, but upon learning of the IDHR charge abandoned that plan and filed the chancery action instead; (2) Neuberger's email of May 4, 2017, demonstrated the board's intent to take the offensive after being put on the defensive by the IDHR charge; and (3) the association's actions in the chancery lawsuit demonstrated the suit was filed in retaliation where the association did not attempt to seek to inspect unit 308 until 10 months after the chancery suit was filed.

¶ 15    In reply, defendants asserted that plaintiffs could not prove that the association's actions were pretextual because the undisputed evidence demonstrated that unit 308 was in grave disrepair which constituted a violation of the association's governing documents. According to defendants, these violations made it absolutely necessary for the association to initiate litigation in order to protect its membership.

¶ 16    The depositions of the board members were included with the motion for summary judgment. Neuberger, president of the board in 2017, testified as follows. He currently resides in unit 208 of 600 Naples Court, which is directly below plaintiffs' unit 308. From the time plaintiffs moved into the building in 2014, he would hear the footsteps of the children running back and forth between the hours of 10 p.m. and 2 a.m. multiple times a week. In 2016, he would knock on the ceiling and the noise would abate. However, in the latter half of 2016, his knocks would go unanswered and the noise would continue. He never made a formal complaint to the board about what he deemed to be excessive noise. According to Neuberger, other residents such as Anna Moscicak and Andrea Miller complained about the noise coming from unit 308 in 2015 or 2016.

¶ 17    In January 2017, Neuberger became board president. He could not recall what was said about unit 308 during the January 2017 board meeting but thereafter, on January 25, 2017, Neuberger sent unit 308 a warning letter about the excessive noise. Neuberger testified he mailed the certified letter through the U.S. mail. He further testified that between January 2017 and April 2017 he called the police three times regarding the excessive noise. The police, however, did not hear any excessive noise coming from unit 308.

¶ 18    According to Neuberger, near the end of January 2017, a plumbing contractor took photographs of unit 308. Neuberger testified he did not authorize the plumber to take

photographs of unit 308, but he did show these photographs to the other board members. Upon viewing these photographs Neuberger became concerned for the children residing therein, "it was conveyed to me by [the plumbers] that [the unit] was quite gross and that it could have been hazardous for children to live in that environment and that also there's a potential risk to the building that infestation might occur."

¶ 19    After receiving this information, Neuberger reached out to the association's legal counsel and asked them to prepare a letter to Thai about the condition of his unit. Counsel forwarded Thai a letter on February 8, 2017. The letter advised Thai that "[t]he condition of your unit is of grave concern to the Board based upon the fact that it may be both a health and safety hazard for yourself and the other residents of the building." The letter further indicated the board's concern that "the condition of your unit may promote bugs or other vermin in and around your unit." The letter recited the association's declaration that provided Thai keep his unit "in good condition and repair." Accordingly, the Board "demanded" that he take the steps necessary to ensure the unit is cleaned and organized appropriately. Thai was given notice that the work on his unit be performed within seven days of the date of the letter "to avoid further action by the Board" and that he must thereafter submit to an inspection of his unit. The letter stated that if this directive was not complied with, "the Board has the authority to enter your unit and perform the cleaning of your unit and all costs will be charged back to you accordingly. The Board also has the authority to assess a fine against you for each and every day that this condition remains and the violation has not been cured." In closing, the letter provided that, "[y]our cooperation is anticipated in order to avoid further legal action by the Association."

¶ 20    Neuberger also testified about the April 2017 board meeting wherein the board discussed assessing fines against unit 308. These fines were for noise, moving-out in contravention of the

association's rules and regulations, and failure to allow them to inspect the unit. According to Neuberger, "I'm not really trying to punish people with fines. I'm trying to get their attention, so I usually err towards the smallest possible fine, which is I believe is [*sic*] $50, and usually whenever we're fining somebody, it's usually just to get them to come to a board meeting to address an issue we have with them." When directly asked whether it was his contention that he wanted to issue the fines against unit 308 because he wanted to get their attention, Neuberger replied, "Well, they had – they had been ignoring us, and we – that's a tool we utilize to get the building's business done." Neuberger further testified that "[m]y intention was to solve these issues." Throughout his deposition, Neuberger emphasized wanting to have a "neighborly discussion" with Thai and Neuberger later testified that, "[t]he issuing of fines was purely to get some kind of attention from them to, you know, come together as neighbors and fix the issues. That was always my intention."

¶ 21    Neuberger then testified regarding the letter he and Rose drafted to Thai regarding the fines and the hearing before the board. According to Neuberger, the purpose of the letter was to give Thai notice of the fines and the hearing date of April 25, 2017. He could not recall who was responsible for providing Thai with the letter. While he acknowledged that the rules and regulations required letters to unit owners be served through the U.S. mail, Neuberger could not recall if the April 25, 2017, letter to Thai was forwarded in that manner.

¶ 22    Neuberger also testified regarding a text message exchange he had with Rose on April 20, 2017, regarding the letter to Thai. The messages included a photograph of the notice requirements as set forth in the rules and regulations. In the text message exchange, Neuberger stated that the letter was not mailed to Thai. Neuberger then texted, "If he does not show, we rewrite the letter for the next meeting and mail it, give him another opportunity and do it by the

book." When asked about this statement, Neuberger admitted that it appears he was concerned about not having provided proper notice to Thai pursuant to the rules and regulations.

¶ 23 Regarding plaintiffs' IDHR charge, Neuberger testified he learned of the charge on April 26, 2017, and sent an email to the other board members regarding the charge that same day. According to Neuberger, he was not angry to learn of the charge, but was frustrated by the situation. Thereafter, Neuberger sent the May 4th email to the board. According to Neuberger, the nature of the May 4th email was to "gauge the support for taking actions against the Thais." Neuberger did not feel that filing the chancery action would give the board leverage against plaintiffs in the IDHR charge.

¶ 24 Neuberger could not recall the discussion with the board about initiating chancery litigation against Thai at the May 9, 2017, meeting. When asked if he agreed that the board voted to initiate litigation against the Thais as a result of having learned that the Thais initiated a discrimination charge with the IDHR, Neuberger responded, "Absolutely not, but it was taken into account amongst a laundry list of other things." Neuberger could not recall discussing filing suit in chancery against Thai prior to the filing of the IDHR charge.

¶ 25 Blackenburg testified at her deposition to the following. At the time of the incident at issue she had resided at 600 Naples Court for 28 years and served on the board in one capacity or another for eight years. At the time relevant to this lawsuit she served as a director. Blackenburg testified that she had never personally heard any noise coming from unit 308; however, Neuberger did complain to the board about the noise. She could not recall anyone else complaining. She also could not recall any further details about any of the board meetings or board actions relevant to this case. She offered no testimony regarding the intentions of the board in initiating the chancery litigation nor did she make any mention of the board discussing

filing a lawsuit against plaintiffs. Blankenburg further testified that it was not common for the board to initiate litigation and that she could not recall another instance where the board sued a member of the association.

¶ 26    Thomas Byrne, a member of the board, testified at his deposition that no formal complaints were initiated against unit 308 regarding a noise violation and he has never personally heard any excessive noise emanating from unit 308. He offered no testimony regarding the board's intention to file suit against plaintiffs.

¶ 27    Michele Rose, the board secretary in 2017, testified that she had resided at 600 Naples Court for 30 years. During the time plaintiffs resided at 600 Naples Court, she did not personally hear any excessive noise coming from their unit.

¶ 28    After the April 11, 2017, board meeting, Rose worked with Neuberger to draft the fine violation letter. In regard to drafting the letter, Rose testified about her April 20, 2017, text message conversation with Neuberger. According to Rose, the text messages indicated that if plaintiffs did not appear at the April 25, 2017, board meeting then a new letter advising them of the fine and a new hearing date would be mailed to them in accordance with the association's rules and regulations.

¶ 29    Rose also testified that, with the permission of the board, she recorded their meetings on a tape recorder so she could later create the board meeting minutes. Numerous cassette tapes were turned over to plaintiffs in discovery that involved the pertinent time period (January-May 2017). Attached to this record on appeal was the transcript of the April 11, 2017, board meeting. During that meeting, comments were made that, despite letters being sent to plaintiffs from the association's legal counsel, plaintiffs had not allowed anyone from the board to enter their unit

and therefore the board would move forward with certain fines.[1]  Other comments were made that indicated that certain board members hoped plaintiffs would move out of the building.  As one board member stated, "[o]h, believe me.  They're – listen, if they can't stay up and if they have to worry about the cops being called on them – every evening after 10:00, yes, they will move.  And that's the whole point."  A board member further stated, "[t]he idea of the fine is to push them to come to *** set up a hearing so we can talk to them" and indicated that the board would waive the fine if plaintiffs moved from the building.

¶ 30    Tracy Hoban, a member of the board, testified at her deposition that when she was president of the association in 2016 no noise complaints were brought against unit 308.  She further testified that she had no personal knowledge of excessive noise in unit 308 and she was unaware of any complaints regarding unit 308, aside from Neuberger's.

¶ 31    Hoban also testified regarding board rules and regulations.  According to Hoban, formal complaints against a unit are put in writing with a copy sent to the unit involved.  Then the owners of the unit are provided with the opportunity to attend a board meeting wherein the issue would be discussed.  She further testified that, "The way fines work is we give a warning and if the problem is rectified then no more action is taken.  If the problem persists, then we escalate to fines."

¶ 32    Hoban additionally testified that when she learned of plaintiffs' IDHR charge on April 26, 2017, she and the board were surprised.  At that time, she believed the correct course of

---

[1] We observe that defendants moved to have the board meeting transcripts stricken from the record alleging the voices of the participants were not authenticated.  The trial court took this motion with the motion for summary judgment but did not rule on the motion and defendants never obtained a ruling on this motion.  Despite this fact, we will not identify the individual board members when discussing these transcripts as a determination regarding the voice authentication is better suited for the trial court.

action was to contest the IDHR charge as she strongly believed that defendants did not discriminate against plaintiffs based on their national origin or familial status. She further stated that the association "su[ed] in chancery to protect themselves." Hoban, however, clarified that the May 9, 2017, vote to initiate litigation was not unanimous as one board member, Anna Moscicak, expressed that she would prefer to wait to litigate because plaintiffs were moving. When asked directly by plaintiffs' counsel whether she voted in favor of initiating litigation because plaintiffs stated they were filing a complaint with the Illinois Human Rights Department Hoban responded, "Correct." However, later in her testimony when Hoban was asked whether the chancery suit was initiated because of retaliation against plaintiffs, Hoban responded, "No."

¶ 33    In her deposition, board member Margaret Hock testified that she never personally heard excessive noise coming from unit 308 and she could not recall Moscicak complaining about the noise during the January 2017 board meeting. Hock further testified that Neuberger was pressuring Moscicak during that meeting and ultimately Moscicak said she did not want her name included in the minutes on this issue. According to Hock, there was no proof of excessive noise coming from unit 308 because the only person who complained was Neuberger. Hock could also not recall the board voting to initiate the chancery lawsuit against plaintiffs. She could also not recall ever thinking that it would be a good idea for the board to initiate litigation against plaintiffs. According to Hock, she did not agree with the board's decision to file a lawsuit against plaintiffs because "they really were not doing damage or anything to the complex. *** The only *** person [(]that was Jason[)] that was complaining about it. There was nobody else complaining against that family in the whole building." In addition, when asked if she was aware of any talks to initiate a lawsuit against the plaintiffs before, Hock replied, "I do not really recall discuss[ing] that at the meeting."

¶ 34    After the matter was fully briefed and argued the trial court granted defendants' motion for summary judgment as to the counts under the Act (counts four through six).  Specifically, in regard to count six the trial court found "the evidence plaintiffs present to establish the filing of the Chancery lawsuit was a pretext is insufficient" and that the evidence "does not support a conclusion that the Chancery lawsuit was filed as a retaliatory measure after plaintiffs filed their IDHR complaint."

¶ 35    Plaintiffs moved for the trial court to reconsider granting summary judgment as to count six or, in the alternative, requested the trial court find the matter final and appealable pursuant to Illinois Supreme Court Rule 304(a) (eff. Mar. 8, 2016).  The trial court ultimately denied both plaintiffs' motion to reconsider and their request for Rule 304(a) language.  The matter then proceeded to a jury trial on counts one through three with the jury returning a judgment in favor of plaintiffs on the defamation and invasion of privacy counts against the association.  The jury awarded plaintiffs $60,000 (representing emotional distress damages) plus costs.  This appeal followed.

¶ 36                                    ANALYSIS

¶ 37                                Standard of Review

¶ 38    A motion for summary judgment is properly granted only where the pleadings, depositions, admissions, and affidavits establish that no genuine issue of material fact exists and that the moving party is entitled to judgment as a matter of law.  735 ILCS 5/2-1005 (West 2016); *Herman v. Power Maintenance & Construction, LLC*, 388 Ill. App. 3d 352, 359-60 (2009).  "In determining whether a genuine issue as to any material fact exists, a court must construe the pleadings, depositions, admissions, and affidavits strictly against the movant and liberally in favor of the opponent." *Adams v. Northern Illinois Gas Co.*, 211 Ill. 2d 32, 43

(2004). Material facts are facts that might affect the outcome of the case under the applicable substantive law. *GreenPoint Mortgage Funding, Inc. v. Hirt*, 2018 IL App (1st) 170921, ¶ 17. Summary judgment should not be entered where material facts are disputed, or where the material facts are undisputed but reasonable persons might draw divergent inferences from those facts. *Adams*, 211 Ill. 2d at 43. In reviewing a trial court's grant of summary judgment, we do not assess the credibility of the testimony presented but, rather, determine only whether the evidence presented was sufficient to create an issue of material fact. *Nguyen v. Lam*, 2017 IL App (1st) 161272, ¶ 19. We review the grant of summary judgment *de novo*. *Adams*, 211 Ill. 2d at 43. A *de novo* review entails performing the same analysis a trial court would perform. *Khan v. BDO Seidman, LLP*, 408 Ill. App. 3d 564, 578 (2011).

¶ 39      In addition, summary judgment is a drastic means of disposing of litigation and should be entered only when the right of the moving party is clear and free from doubt. *Gilbert v. Sycamore Municipal Hospital*, 156 Ill. 2d 511, 518 (1993). A defendant moving for summary judgment, as is the case here, may meet the initial burden of production either by affirmatively showing that some element of the case must be resolved in the defendant's favor or by demonstrating the absence of evidence supporting the plaintiff's position on one or more elements of the cause of action. *Hutchcraft v. Independent Mechanical Industries, Inc.*, 312 Ill. App. 3d 351, 355 (2000). The plaintiff is not required to prove his or her case at the summary judgment stage; in order to survive a motion for summary judgment one must present a factual basis that would arguably entitle him or her to a judgment. *Robidoux v. Oliphant*, 201 Ill. 2d 324, 335 (2002). "On appeal, this court will affirm the trial court's decision to grant summary judgment only if, after scrutinizing the record, we are absolutely convinced there is no genuine issue as to any material fact and that the movant was, indeed, entitled to judgment as a matter of

law." *Thompson v. Platt*, 116 Ill. App. 3d 662, 664 (1983).

¶ 40                    Retaliation under section 6-101(A) of the Act

¶ 41    At issue here is count six of plaintiffs' amended complaint which alleged retaliation

under the Act.  Specifically, the Act provides that "it is a civil rights violation for a person, or for

two or more persons to conspire, to *** retaliate against a person because he or she has opposed

that which he or she reasonably and in good faith believes to be unlawful discrimination ***

because he or she has *** made a charge *** under this Act."  775 ILCS 5/6-101(A) (West

2016).  Once a person has filed a charge of discrimination under the Act, regardless of the

disposition of that charge and regardless of whether that charge is meritorious, that person is

protected from retaliation for bringing that charge.  *Dana Tank Container, Inc. v. Human Rights

Commission*, 292 Ill. App. 3d 1022, 1025 (1997).

¶ 42    Although the Act is an Illinois statute, in assessing such claims, we are guided not only

by Illinois case law but also by federal case law relating to federal anti-discrimination statutes,

including but not limited to Title VII of the Civil Rights Act of 1964 (42 U.S.C. § 2000e-2(a)(1)

(2016)), and the anti-retaliation provisions of such federal statutes.  See *Zaderaka v. Illinois

Human Rights Commission*, 131 Ill. 2d 172, 178 (1989) (claims under the Act are to be evaluated

in accordance with federal decisions interpreting federal anti-discrimination laws).

¶ 43    When considering a claim of retaliation under the Act, our courts have adopted the

established standard set forth by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411

U.S. 792 (1973).  See *Terada v. Eli Lily & Co.*, 2015 IL App (5th) 140170, ¶ 25; *Hoffelt v.

Illinois Department of Human Rights*, 367 Ill. App. 3d 628, 634 (2006).  Under this framework, a

plaintiff can prove its case through either "direct evidence" or "the indirect method of proof."  *Id.*

at 632-33.[2]  For the indirect method, such is at issue in this case, the courts use the burden-shifting analysis articulated in *McDonnell Douglas*.  *Id.* at 634.  The plaintiff must first produce enough evidence to establish a *prima facie* case.  To establish a *prima facie* case of retaliation, the plaintiffs here must demonstrate that (1) they were engaged in a protected activity; (2) the defendants committed a material adverse act against them; and (3) a causal nexus existed between the protected activity and the adverse act.  *Id.*  Once the plaintiff has met this burden a presumption arises which, if not rebutted, could lead to a judgment in the plaintiff's favor.  *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 259-60 (1981).  This presumption may be rebutted by the defendant articulating a legitimate, nondiscriminatory reason for its action.  *Id.* at 257.  Once such a reason is offered, the presumption drops from the case and the plaintiff "must have the opportunity to demonstrate that the proffered reason was not the true reason" for the defendant's decision.  *Id.* at 256.

¶ 44                                          Pretext

¶ 45    To avoid the entry of summary judgment, the plaintiff must present evidence raising an inference that the adverse action was motivated, at least in part, by an improper retaliatory motive.  See *Lau*, 2019 IL App (2d) 180456, ¶ 53 (applying the *McDonnell Douglas* outline to an employment discrimination claim).  The plaintiff can do so by, among other things, pointing

---

[2] We observe that the Seventh Circuit recently cautioned courts to consider the evidence as a whole and "stop separating 'direct' from 'indirect' evidence and proceeding as if they were subject to different legal standards."  *Ortiz v. Werner Enterprises, Inc.*, 834 F.3d 760, 765 (7th Cir. 2016).  Regardless, the *McDonnell* method may still act to provide us with the appropriate framework from which to view these claims.  See *Lau v. Abbott Laboratories*, 2019 IL App (2d) 180456, ¶ 41 (pointing out that "the *McDonnell Douglas* burden-shifting approach is not a requirement in employment discrimination claims."  Rather, the approach is a means of organizing, presenting, and assessing circumstantial evidence in frequently recurring factual patterns found in discrimination cases; it is not the only way to assess circumstantial evidence of discrimination).

to evidence suggesting that the defendant's proffered reason is pretextual and unworthy of credence. *Burdine*, 450 U.S. at 256. The Seventh Circuit has cautioned that courts considering whether a plaintiff has met its burden must not conduct overly narrow inquiries that distinguish direct from indirect evidence of discriminatory intent: "[e]vidence must be considered as a whole, rather than asking whether any particular [type or] piece of evidence proves the case by itself." *Ortiz*, 834 F.3d at 765.

¶ 46 The issue of whether the defendant's stated reason is a pretext is a question of fact. *Lau*, 2019 IL App (2d) 180456, ¶ 53; *Zaderaka*, 131 Ill. 2d at 180. However, the issue of whether sufficient evidence of pretext was presented by the plaintiff is a question of law. See *e.g.*, *Asset Recovery Contracting, LLC v. Walsh Construction Co. of Illinois*, 2012 IL App (1st) 101226, ¶ 101 (observing that whether the evidence was sufficient to establish a claim for damages so as to survive a motion for summary judgment was a question of law). " 'Pretext involves more than just faulty reasoning or mistaken judgment on the part of the employer.' [Citation.] Rather, a pretext is 'a phony reason for some action.' [Citation.] A plaintiff can raise a sufficient inference of pretext to survive summary judgment by showing that the [defendant's] stated reason is implausible or contradictory." *Lau*, 2019 IL App (2d) 180456, ¶ 55 (citing *Argyropoulos v. City of Alton*, 539 F.3d 724, 736 (7th Cir. 2008); *Russell v. Acme-Evans Co.*, 51 F.3d 64, 68 (7th Cir. 1995); *Coleman v. Donahoe*, 667 F.3d 835, 852 (7th Cir. 2012)). A plaintiff can establish pretext by demonstrating that: (1) the articulated reason had no basis in fact; (2) the reason did not actually motivate the decision; or (3) the reason was insufficient to motivate the decision. See *Sola v. Illinois Human Rights Commission*, 316 Ill. App. 3d 528, 537 (2000) (applying framework in an employment discrimination context).

¶ 47 Here, the parties do not dispute that plaintiffs set forth a *prima facie* case and that

defendants set forth a legitimate nondiscriminatory basis for filing the chancery action. What is at issue is whether plaintiffs presented sufficient evidence of pretext to survive a motion for summary judgment. Plaintiffs maintain that the following is sufficient evidence of pretext: (1) prior to learning of the IDHR charge Neuberger and Rose discussed providing plaintiffs with proper notice for the violation hearing, however, after the board learned of the IDHR charge, this plan was abandoned and the board members instead voted to file the chancery action without first affording plaintiffs the proper notice and a hearing; (2) Neuberger's email of May 4, 2017, demonstrated that he believed the IDHR charge put the board on the defensive and he felt the need to take the offensive by initiating litigation against plaintiffs; and (3) defendants' lack of prosecution of the chancery action calls into question whether defendant's decision to initiate litigation against plaintiffs was motivated by their desire to ensure that unit 308 was in good repair and compliant with the association's governing documents. Neuberger admitted that one of the factors in the filing of the lawsuit was the IDHR charge filed by defendant.

¶ 48    In response, defendants maintain that the chancery litigation was a continuation of the ongoing dispute between the parties and was, therefore, a legitimate nondiscriminatory adverse action. Defendants assert that the temporal proximity of the IDHR charge and the chancery action is not enough to establish pretext. Moreover, defendants contend that it is clear from the record that the association always intended to initiate litigation against the plaintiffs if they continued to fail to comply with the governing documents. Defendants point to the letters sent by their counsel, maintaining that these letters provided plaintiffs with warnings that if they failed to address the association's issues "the Association would have no other choice but to initiate litigation against them." Defendants also note that the board meeting minutes of January 2017 regarding unit 308 provide that "legal action will need to be taken if this is not remedied in

the near future." Defendants maintain that the decision to initiate litigation "was not a 'cloak' masking the Association's true intentions, but, instead, was always the Association's plan in the event the Plaintiffs continued to fail to comply with the Association's governing documents."

¶ 49    Viewing the evidence in light most favorable to the nonmoving party, in this case the plaintiffs, we conclude that there was sufficient evidence of pretext in the record to preclude the entry of summary judgment. After a thorough review of the record, we find there is enough evidence whereby the trier of fact could find that defendants' legitimate nondiscriminatory reason for initiating the chancery action did not actually motivate that decision. See *Sola*, 316 Ill. App. 3d at 537. The deposition transcripts of the board members reveal that it was not until late April, at the earliest, that the board began contemplating the chancery litigation. It is clear from the record that the board first sent Thai an internal warning letter from the board about the excessive noise complaint in January 2017. Thereafter, when the condition of unit 308 became an issue, the association's legal counsel sent Thai a demand letter ordering him to clean the unit and allow the association to inspect it. The letter provided that if Thai failed to do so that fines could be collected against the unit and that it would be cleaned by the association. Then, at the April board meeting, the board members discussed fining Thai. Both Neuberger and Hoban testified in their depositions that fines were not a means of punishment, but a way to bring Thai before the board for a discussion of the issues.

¶ 50    It is apparent from the deposition testimony that, at the time of the assessment of the fines against unit 308 (April 11, 2017), the board members sought to engage Thai in a "neighborly conversation" in hopes of remedying the issue internally. This reason clearly contradicts defendants' argument that they had been moving towards litigation against plaintiffs since January 2017. See *Coleman*, 667 F.3d at 852 (stating that, in the context of retaliatory discharge,

a plaintiff can raise a sufficient inference of pretext to survive summary judgment by showing that the stated reason for discharge is implausible or contradictory). This contradiction is further apparent through Rose and Neuberger's text message conversation wherein they contemplated what the board would do if Thai did not appear at the hearing. As they discussed, if he did not appear, they would notify him again and do it "the right way." This, however, was never done as the board learned of the IDHR charge the day after the April 25th board meeting. See *Joll v. Valparaiso Community Schools*, 953 F.3d 923, 931 (7th Cir. 2020) (a jury could find that a deviation from standard procedures supports a claim of pretext). The record thus demonstrates that instead of following through with their intent to bring Thai before the board to have a "neighborly conversation," they began discussing what they could do in response to the IDHR charge. While Hoban believed it best to respond to the charge within the forum of the IDHR, Neuberger's emails and deposition testimony indicate that he was more interested in going on the offensive. In fact, it was not until Neuberger's May 4th email that the record specifically addresses the board's interest in filing the chancery litigation. As Neuberger testified at his deposition, his May 4th email was to "gauge the support for taking actions against the Thais." Even then, there was testimony that filing litigation against unit 308 was not unanimous. In addition, none of the board minutes or the recordings of board meetings indicate the board's intent to litigate unit 308's various violations. It was not until May 9, 2017, that litigation against unit 308 is formally discussed at a board meeting.

¶ 51    In sum, the evidence points to defendants seeking an amicable resolution to the issues with unit 308 in a neighborly way up and until the IDHR charge was filed. Multiple board members testified that they viewed the fines levied against unit 308 as a means to get plaintiffs to attend a board meeting where they could discuss the issues and come to a resolution. Based on

the evidence presented, we find that there is enough evidence to create a genuine issue of material fact as to whether defendants' legitimate nondiscriminatory basis for filing the chancery litigation was merely pretext. See *Lau*, 2019 IL App (2d) 180456, ¶ 56. This issue belongs before a trier of fact.

¶ 52    In rendering this determination, we have considered the arguments and evidence put forth by defendants. Regarding their claim that the attorney letters sent to plaintiffs demonstrated their intent to proceed with litigation, we disagree. Each of the three attorney letters end with a sentence encouraging plaintiffs to fully comply with the directions of the letter "in order to avoid further legal action by the Association." At no point is it discussed in the letters what "further legal action" entails. Indeed, these letters only assert that potential fines could be incurred for plaintiffs' noncompliance. Moreover, at the time these letters were sent, no fines had yet been issued against unit 308.

¶ 53    Defendants also point to the board minutes of January 2017 wherein it is stated that "legal action will need to be taken if this is not remedied in the near future" as evidence of their intent to pursue the chancery litigation. Again, the term "legal action" is not explained or expounded upon in the board meeting minutes. In fact, no subsequent board meeting minutes reference any potential legal action against plaintiffs. As previously discussed, the record demonstrates that from January through April 2017 defendants were not contemplating filing a chancery action against plaintiffs. Multiple board members testified that they viewed the fines against unit 308 as a means to begin a conversation with them. Their depositions further indicate a desire to resolve the dispute as neighbors and not as litigants. Even Neuberger testified, "The issuing of the fines was purely to get some kind of attention from them to, you know, come together as neighbors and fix the issues. That was always my intention."

¶ 54    We thus conclude that the trial court erred when it granted summary judgment in defendants' favor and therefore reverse the ruling and remand the matter to the trial court for further proceedings.

¶ 55                              CONCLUSION

¶ 56    For the reasons stated above, we reverse the judgment of the circuit court of Cook County granting summary judgment in favor of defendants and remand the matter for further proceedings.

¶ 57    Reversed and remanded.

**No. 1-19-2408**

| | |
|---|---|
| **Cite as:** | *Thai v. Triumvera 600 Naples Court Condominium Association*, 2020 IL App (1st) 192408 |
| **Decision Under Review:** | Appeal from the Circuit Court of Cook County, No. 17-L-8840; the Hon. Allen P. Walker, Judge, presiding. |
| **Attorneys for Appellant:** | Michael Lee Tinaglia, and Brian J. Olszewski, of Law Offices of Michael Lee Tinaglia Ltd., of Park Ridge, Illinois, for appellant. |
| **Attorney for Appellee:** | Janelle Ann Dixon, of Kovitz Shifrin Nesbit, of Mundelein, Illinois, for appellee. |